# EXHIBIT B

Page 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------x
SM KIDS, LLC, a Delaware limited liability company, as successor-in-interest to STELOR PRODUCTIONS, LLC,

                    Plaintiff,

    -against-

GOOGLE LLC, a Delaware limited liability company; ALPHABET INC., a Delaware corporation; XXVI HOLDINGS INC., a Delaware corporation; and JOHN AND/OR JANE DOES 1-100, Inclusive,

                    Defendants.

   VIDEOTAPED DEPOSITION OF STEPHEN J. GARCHIK
       New York, New York
       Thursday, August 2, 2018

Reported by:
Amy A. Rivera, CSR, RPR, CLR
JOB NO. 145577

Page 2

                August 2, 2018
                10:09 a.m.

     Videotaped deposition of STEPHEN J.
GARCHIK held at the office of COOLEY LLP, The Grace
Building, 1114 Avenue of the Americas, New York, New
York, pursuant to Notice, before Amy A. Rivera,
Certified Shorthand Reporter, Registered
Professional Reporter, Certified LiveNote Reporter,
and a Notary Public of the States of New York, New
Jersey and Delaware.

Page 3

A P P E A R A N C E S:
DAVIS WRIGHT TREMAINE
Attorneys for Plaintiffs
    1251 Avenue of the Americas
    New York, New York  10020
BY:  JOHN MAGLIERY, ESQ.
     L. DANIELLE TOALTOAN, ESQ.

COOLEY
Attorneys for Defendants
    The Grace Building
    1114 Avenue of the Americas
    New York, New York  10036
BY:  IAN SHAPIRO, ESQ.
     KEVIN MEAD, ESQ.
     BRENDAN HUGHES, ESQ.

A L S O   P R E S E N T:
    Matthew Smith, Legal Video Specialist

Page 4

  1       STEPHEN J. GARCHIK
  2       VIDEOGRAPHER:  This begins media
  3  labeled No. 1 of the video-recorded
  4  deposition of Stephen Garchik, in the matter
  5  of SM Kids, LLC v. Google, LLC, et al., for
  6  the Supreme Court of the State of New York,
  7  County of New York.
  8       This deposition is being held at 1114
  9  Avenue of the Americas in New York, New
 10  York, on August the 2nd, 2018, at
 11  approximately 10:09 a.m.
 12       My name is Matthew Smith for TSG
 13  Reporting, Incorporated.  I'm the legal
 14  video specialist.
 15       The court reporter is Amy Rivera in
 16  association with TSG Reporting.
 17       Will counsel please introduce yourself
 18  for the record.
 19       MR. SHAPIRO:  Ian Shapiro, Kevin Mead,
 20  and Brendan Hughes for the defendants.
 21       MR. MAGLIERY:  And it's John Magliery
 22  and Danielle Toaltoan for the plaintiff.
 23       VIDEOGRAPHER:  Thank you.
 24       Will the court reporter -- court
 25  reporter please swear in the witness.

Page 5

  1       STEPHEN J. GARCHIK
  2  S T E P H E N   J.   G A R C H I K, having been
  3  duly sworn, testified as follows:
  4       MR. MAGLIERY:  Madam Reporter, have
  5  you entered any of the pro forma
  6  stipulations into the record?
  7       COURT REPORTER:  Not yet.
  8       MR. MAGLIERY:  Thank you.
  9       MR. SHAPIRO:  Which pro forma
 10  stipulations did you have in mind?
 11       MR. MAGLIERY:  If there's none, then I
 12  don't -- I just want to know if they've been
 13  entered.
 14       MR. SHAPIRO:  Oh, I see.  Yeah.
 15  EXAMINATION
 16  BY MR. SHAPIRO:
 17       Q.   Mr. Garchik, you understand that
 18  you're under oath this morning?
 19       A.   Yes.
 20       Q.   Have you had your deposition taken
 21  before?
 22       A.   Yes.
 23       Q.   Okay.  And you understand that
 24  although you can take breaks throughout the day,
 25  you can't take a break while a question is pending

Page 14

1  STEPHEN J. GARCHIK
2  for the GOOGLES business?
3      A.  I got what I would call a sources and
4  uses statement than a general ledger, but it's
5  like a general ledger.
6      Q.  What information did the sources and
7  uses statement contain?
8      A.  It showed how much money was spent in
9  the period it was reporting, and then who will --
10 what bills were paid and to who --
11     Q.  Okay?
12     A.  -- the amount.
13     Q.  That sounds like uses.
14         What about sources?
15     A.  The sources were the money that I was
16 contributing.
17     Q.  Okay.  And you were contributing the
18 money personally or SJM was contributing the
19 money?
20     A.  In -- in the period of time when SJM
21 was the owner, SJM was contributing the money.
22     Q.  Okay.  And did SJM Partners prepare a
23 profit and loss statement for the GOOGLES
24 business?
25         MR. MAGLIERY:  Objection.

Page 15

1  STEPHEN J. GARCHIK
2      A.  It just prepared the sources and uses.
3      Q.  Okay.  Did -- did SJM Partners prepare
4  a balance sheet for the GOOGLES business?
5          MR. MAGLIERY:  Objection.
6      A.  It just prepared the sources and uses.
7      Q.  Okay.  And would the sources and uses
8  document be prepared annually, or less regularly
9  than that?
10     A.  It -- it -- well, it was prepared
11 annually, yes.
12     Q.  Okay.  And you said it was prepared by
13 the SJM Partners' accounting staff.  Is that
14 right?
15     A.  Yes, sir.
16     Q.  And was any office space of SJM
17 Partners allocated to the GOOGLES business?
18         MR. MAGLIERY:  Objection.
19     A.  Well, the people that worked on SJM
20 business that were also asked to work on the
21 GOOGLES business --
22     Q.  Right, fair enough.
23     A.  -- obviously were.
24     Q.  And that would be Tammy and the
25 accounting people?

Page 16

1  STEPHEN J. GARCHIK
2      A.  Tammy and the accounting people.
3      Q.  Were there any -- did you store
4  records of the GOOGLES business at SJM Partners?
5      A.  We did.
6      Q.  And where were they stored, in -- in
7  Reston, Virginia or in Florida?
8          MR. MAGLIERY:  Object to form.
9      A.  Well, depends when you're asking.
10     Q.  In or around 2013, when the assets
11 were transferred.
12     A.  They -- they were stored in three
13 places.  Obviously -- maybe four -- computers,
14 people's computers, in the Reston office, in Iron
15 Mountain Storage, you know, offsite, and then the
16 records I had were stored in Florida.
17     Q.  In your office in Florida --
18     A.  In my office in Florida.
19     Q.  -- or in your home?  Okay.
20     A.  Yeah, in my office.
21     Q.  And -- and -- and we'll come to this
22 later, but just so that the record is clear, your
23 recollection is that SJM Partners became the --
24 became the owner of the GOOGLES business in or
25 around early 2013, is that about right?

Page 17

1  STEPHEN J. GARCHIK
2          MR. MAGLIERY:  Objection.
3      A.  I'm not sure.
4      Q.  Okay.  What's your best recollection?
5      A.  Well, my best recollection would be
6  whatever the assignment agreement said --
7      Q.  Okay.
8      A.  -- that it occurred.
9      Q.  I can represent to you, and then I'll
10 show it to you later in the day, that it was
11 January 1st, 2013.
12     A.  Okay.
13     Q.  And in -- and when did SJM Partners
14 stop being an owner of the GOOGLES business?
15     A.  When did it stop?
16     Q.  Yeah.
17     A.  When we transferred it to SM Kids.
18     Q.  Okay.  So earlier this year?
19     A.  Earlier this year.
20     Q.  Earlier this year, right.
21         And was SJM Partners the sole owner of
22 the GOOGLES business during that roughly four-year
23 period?
24     A.  Yes.
25     Q.  Okay.  So '13, '14, '15, '16, '17,

Page 18

1  STEPHEN J. GARCHIK
2  roughly a five-year period?
3      A.  Yes, five years.
4      Q.  Okay.  And during that five-year
5  period when SJ Partners was the sole owner of the
6  GOOGLES business, did -- did the business
7  contribute any income to SJM Partners' bottom
8  line?
9          MR. MAGLIERY:  Objection.
10     A.  Net income?  To the bottom line?
11     Q.  Let's start there, net income.
12     A.  No.
13     Q.  Okay.  What about revenue -- gross
14 revenue?
15     A.  We had some revenue during that period
16 of time.
17     Q.  How much?
18     A.  I don't recall.
19     Q.  Roughly?
20     A.  I'm sorry.  I don't recall.
21     Q.  More than $1,000?
22     A.  I'm not sure.
23     Q.  More than $100?
24     A.  Definitely more than $100.
25     Q.  More than $500?

Page 19

1  STEPHEN J. GARCHIK
2      A.  I believe more than $500.
3          MR. MAGLIERY:  I'll admonish the
4  witness that you are under oath and you
5  should not speculate about your answers.  If
6  you don't know, you don't know.
7          THE WITNESS:  Okay.
8      Q.  Do you want to change your answer or
9  you're confident that it was more than $500?
10     A.  I -- it's just easier to say I
11 don't -- I don't know.
12     Q.  Okay.  But are you -- and -- and just
13 in light of John's admonition, are you confident
14 that it's more than $100?
15     A.  Yes.
16     Q.  Okay.  And what was the source of that
17 revenue?
18     A.  We sold t-shirts, hats, I guess --
19     Q.  Go ahead.  Sorry.  T-shirts, hats?
20     A.  We sold copies of the book, "The
21 Googles From Goo."
22         Those are the ones I recall.
23     Q.  Okay.  And how many copies of the book
24 were sold?
25     A.  I don't recall.

Page 20

1  STEPHEN J. GARCHIK
2      Q.  Was it more than five?
3      A.  I don't recall.
4      Q.  Was it more than one?
5      A.  I don't recall.
6      Q.  Do you recall anyone who bought the
7  book?
8      A.  I didn't sell the books.  The books
9  were sold by Matt Mazer.
10     Q.  Who provided him with the books to
11 sell?
12     A.  We gave him the book to sell.
13     Q.  How many books did you give him -- how
14 many copies of the book did you give him to sell?
15         MR. MAGLIERY:  Objection.
16     A.  I don't recall.
17     Q.  Was it more than one?
18     A.  We gave him one book that he could
19 make copies of to sell, as I recall.  So he could
20 make as many as he needed.
21     Q.  I see.
22         But you don't know whether he sold one
23 book or more than one book?
24     A.  I don't recall.
25     Q.  And you don't know anyone he sold the

Page 21

1  STEPHEN J. GARCHIK
2  book to?
3      A.  I do not.
4      Q.  Do you know how he sold them?  Did he
5  put them on Amazon or did he sell them through a
6  network of people that he knew?
7          Or do you -- do you know how he sold
8  the book, through what distribution method?
9          MR. MAGLIERY:  Objection.
10     A.  I don't know through what distribution
11 method he sold them.
12     Q.  Do you know how much he charged for
13 the book?
14     A.  I don't remember.
15     Q.  Do you know whether he was entitled to
16 a commission on the book or a markup?
17         MR. MAGLIERY:  Objection.
18     A.  The arrangement we had with him is he
19 wasn't.
20     Q.  Okay.
21         Okay.  So that's -- that's the book.
22         Would SJM Partners' records reflect
23 how many books were sold?
24     A.  It would reflect any receipts that
25 came in, but I don't know, unless it knew what it

**Page 22**

1  STEPHEN J. GARCHIK
2  was sold for, if it would know how many books were
3  sold.
4     Q.  But would there be receipts associated
5  with the book sales or they would just be
6  receipts?
7     A.  Receipts.
8     Q.  So they wouldn't designate the
9  receipts as resulting from the book sales?
10    A.  I'm not sure.
11    Q.  ==Okay.  And the -- the T-shirts, you==
12 ==talked about T-shirts, those are the T-shirts sold==
13 ==on the Peace Love Solve website?==
14    A.  Yes, sir.
15    Q.  And -- and Peace Love Solve is your
16 wife's apparel company, correct?
17    A.  Yes.
18    Q.  And that's a private for-profit
19 company that gives some of the proceeds to Autism
20 Speaks and other philanthropies.  Is that right?
21       MR. MAGLIERY:  Objection.
22    A.  It's a private company, and a
23 percentage of everything she sells goes to
24 charity.
25    Q.  Right, not just the T-shirt -- the

**Page 23**

1  STEPHEN J. GARCHIK
2  GOOGLES T-shirts?
3     A.  Any -- any product she has --
4     Q.  Okay.
5     A.  -- goes to charity.
6     Q.  Okay.  And does all of the profit go
7  to charity or a portion of the profits go to
8  charity?
9        MR. MAGLIERY:  Objection.
10    A.  Well, a percentage of the sales price
11 goes to charity.
12    Q.  Okay.
13    A.  That's how it's set up.
14    Q.  Okay.  And the -- the -- and when
15 did -- when did Peace Love Solve start selling
16 GOOGLES T-shirts?
17    A.  I think it was 2017.
18    Q.  Okay.  And that was after Bungalow
19 created the -- the new logo?
20       MR. MAGLIERY:  Objection.
21    Q.  Let me ask you an easier question:
22 Who designed the T-shirts?
23    A.  My wife ultimately designed the
24 t-shirts.
25    Q.  Who designed the graphic that's

**Page 24**

1  STEPHEN J. GARCHIK
2  imprinted on the T-shirt.
3     A.  On some of them, she used the logo
4  that Bungalow did, and on others, she didn't.
5     Q.  She designed it herself?
6     A.  She designed it herself.
7     Q.  ==And -- and the revenue from the sale==
8  ==of the T-shirts on the Peace Love Solve website,==
9  ==do those revenues belong to Peace Love Solve?==
10       MR. MAGLIERY:  Objection.
11    A.  The revenues -- repeat the question?
12 I'm sorry.
13    Q.  The revenues collected from the sale
14 of the GOOGLES T-shirts on the Peace Love Solve
15 website, are those revenues of Peace Love Solve?
16       MR. MAGLIERY:  Objection.
17    A.  Peace Love Solve for tax purposes
18 books revenue for any shirt that it sells.
19    Q.  And pays taxes on that revenue?  Pays
20 sales tax?
21    A.  It pays sales tax.
22    Q.  And then that revenue is deposited in
23 Peace Love Solve's bank account?
24    A.  That's correct.
25    Q.  Okay.  And the hats that you were

**Page 25**

1  STEPHEN J. GARCHIK
2  referring to, are those hats also sold on the
3  Peace Love Solve website?
4     A.  Yes, sir.
5     Q.  Okay.  And do those have a -- a
6  GOOGLES logo on them?
7     A.  Some do.
8     Q.  Okay.  And the ones that do, is that
9  logo the logo that was designed by Bungalow or was
10 that designed by your wife?
11    A.  If the hat has the logo that was
12 designed by Bungalow, then it's a -- it was a
13 Bungalow-designed hat.
14    Q.  Okay.
15    A.  If it has -- one that's designed
16 different than the Bungalow logo, then it's a logo
17 designed by my wife.
18    Q.  And -- and I think you said that you
19 started selling the T-shirts in 2017?
20       Did you say when in 2017?
21    A.  I did not.
22    Q.  Okay.  Roughly when in 2017?
23    A.  I don't recall.
24    Q.  Early or late or --
25    A.  I'm sorry.  I don't recall.

```
                                                    Page 26
 1              STEPHEN J. GARCHIK
 2      Q.   That's okay.
 3           And is the same true of the hats,
 4  sometime in 2017?
 5      A.   Yes, sir.
 6      Q.   And in both cases, is it when the
 7  items began appearing on the Peace Love Solve
 8  website?
 9           MR. MAGLIERY:  Objection.
10      A.   Well, to the extent they were sold off
11  the website, then they were sold once they
12  appeared on the website.  But they could have been
13  sold prior to that --
14      Q.   Okay.
15      A.   -- before putting them up other
16  website.
17      Q.   Okay.  Let me -- with -- with respect
18  to the money that Peace Love Solve collects from
19  the sale of the T-shirt and the hats and pays
20  sales tax on, has any of that money been remitted
21  to the GOOGLES business?
22      A.   I don't know.
23      Q.   Well, has Peace Love Solve written any
24  checks to the GOOGLES business?
25           MR. MAGLIERY:  Objection.
```

```
                                                    Page 27
 1              STEPHEN J. GARCHIK
 2      A.   I don't know.
 3      Q.   What percentage of the sale proceeds
 4  that Peace Love Solve collects on the sale of the
 5  t-shirts and the hats is the GOOGLES business
 6  entitled to?
 7           MR. MAGLIERY:  Objection.
 8      A.   Well, it's entitled to -- if the shirt
 9  sales price, after giving away the portion to
10  charity, exceeded the cost so that there was any
11  money left over, then I don't recall what the deal
12  is between Peace Love Solve and SM Kids.
13      Q.   Is there an agreement that defines the
14  economic relationship between SM Kids and Peace
15  Love Solve?
16      A.   You mean written agreement?
17      Q.   Yes.
18      A.   No.
19      Q.   Was there a written agreement between
20  SJM and Peace Love Solve that defined the economic
21  relationship in connection with the sale of the
22  t-shirts or the hat?
23      A.   No.
24      Q.   Is there an oral agreement governing
25  the sale of the T-shirts and hats between Peace
```

```
                                                    Page 28
 1              STEPHEN J. GARCHIK
 2  Love Solve and either SJM Partners or SM Kids?
 3      A.   There's -- there's an understanding.
 4      Q.   And what is the understanding?
 5      A.   That SM Kids would get whatever the
 6  net was left after the sale of the shirt.
 7      Q.   Okay.  After the allocation to
 8  charity --
 9      A.   Charity.
10      Q.   -- and over the cost?
11      A.   If anything.
12      Q.   If anything.
13           And do you know whether there is a
14  margin on those sales?
15      A.   I don't --
16      Q.   After the cost --
17      A.   I don't know if there is a margin on
18  those sales.
19      Q.   ==And you don't know whether any money's
20  ever been remitted either to SJM or to SM Kids for
21  the sale of those T-shirts and hats?==
22      A.   I don't recall.
23      Q.   Okay.  And -- and -- and with respect
24  to the books, you don't know how much Matt Mazer
25  every admitted either -- well, how much Matt Mazer
```

```
                                                    Page 29
 1              STEPHEN J. GARCHIK
 2  remitted to SJM for the sale of the books, do you?
 3      A.   I do not.
 4      Q.   ==Okay.  And we went down this road when
 5  we were talking about how much gross revenue SJM
 6  Partners had earned from the GOOGLES business, and
 7  I think you weren't sure whether it was more or
 8  less than $500, but you thought it was more than
 9  $100, correct?==
10           MR. MAGLIERY:  Objection.
11      A.   I -- I said it was more than $100.
12      Q.   Right.  And when I asked you about
13  500, you weren't sure, correct?
14      A.   I didn't recall.
15      Q.   Okay.  So with respect to the revenue
16  that SJM Partners earned from the GOOGLES
17  business, it -- am I correct that it would have
18  only come from the book because you don't recall
19  any monies being remitted for the t-shirts or the
20  hats?
21           MR. MAGLIERY:  Objection.
22           He said he didn't recall it.  He
23  didn't say it didn't happen.
24      Q.   Well, let me:  What -- what did you --
25  when we talked about the source of that revenue,
```

## Page 30

```
 1              STEPHEN J. GARCHIK
 2   we talked about the T-shirts, hats, and copies of
 3   the book.
 4         Now that we've walked through each of
 5   those categories, is it your belief that any money
 6   that came into SJM Partners would have come from
 7   Matt Mazer's sale of the book?
 8         MR. MAGLIERY:  Objection.
 9      A.   Well, it's my -- it's my belief that
10   the money from the sale of the book that came --
11   came to SJM Partners came to SJM Partners.
12      Q.   Right.
13      A.   And I said I didn't recall if any
14   money from the other sources came in or not.
15      Q.   Okay.  And you worked with Matt Mazer
16   for about a year, correct?
17      A.   Yes.
18      Q.   At a certain point, you parted ways
19   with Matt Mazer in early 2014, correct?
20      A.   I don't remember if it was early 2014
21   or end of '13, but we did part ways.
22      Q.   And -- and -- and your working
23   relationship with him lasted about a year.  Is
24   that correct?
25         MR. MAGLIERY:  Objection.
```

## Page 31

```
 1              STEPHEN J. GARCHIK
 2      A.   Well, we had a signed contract.  So
 3   however long the contract lasted is how long the
 4   working relationship lasted.
 5      Q.   Okay.  Okay.  And we'll look at that.
 6         And what -- what I really just wanted
 7   to establish is that to the extent that he sold
 8   books and collected revenue from the sale of those
 9   books, that would have been during the period he
10   was under contract?
11         MR. MAGLIERY:  Objection.
12      A.   Well, he was -- one of his
13   responsibilities during the period of the contract
14   was to sell the book.
15      Q.   Okay.  And your recollection is to the
16   extent that there were any revenues from the sale
17   of the book, it would have been during that
18   period?
19      A.   At least during that period.
20      Q.   Well, when else would it have been?
21      A.   Well, we -- we had a relationship that
22   started -- I met him before we signed the
23   contract.
24      Q.   And you arranged for him to sell the
25   book before you signed the contract?
```

## Page 32

```
 1              STEPHEN J. GARCHIK
 2      A.   I -- he made recommendations prior to
 3   us signing the contract that included those kinds
 4   of tasks.  So if he had chosen to start before,
 5   then -- and any revenue that was generated before,
 6   we would have gotten it before.
 7      Q.   Do you have any records of how many
 8   books he sold?
 9         MR. MAGLIERY:  Objection.
10      A.   I don't know.
11      Q.   And with respect to SJM Partners,
12   we've talked about the gross revenue from the
13   GOOGLES business.
14         During the five-year period when SJM
15   Partners owned the GOOGLES business, what -- what
16   was the sum of its expenditures for the business?
17         MR. MAGLIERY:  Objection.
18      A.   I don't remember offhand, though I
19   think we were asked to produce some documents that
20   provided that information.
21      Q.   Okay.  So we'll look at that later --
22   the -- the Stephen Garchik 2012 expenses, 2013
23   expenses?
24      A.   It was broken out by year, I believe.
25      Q.   Okay.  We'll look at that.
```

## Page 33

```
 1              STEPHEN J. GARCHIK
 2   But just do you have a recollection of
 3   the sort of magnitude of the expenses in the
 4   aggregate for that five-year period and how much
 5   you spent on the business or how much SJM Partners
 6   spent on the business?
 7         MR. MAGLIERY:  Objection.
 8      A.   I'm not sure what a "magnitude" is,
 9   but...
10      Q.   Like did you spend a hundred thousand
11   dollars, a million dollars, two or three hundred
12   thousand?
13      A.   I don't remember.  But we have the
14   papers here.  We can check.
15      Q.   Do you have any understanding as you
16   sit here today how much SJM Partners spent on the
17   business during that five-year period?
18      A.   Well, I -- I know what we spent --
19   roughly what we spent for Matt.  That was during
20   that period.
21      Q.   That was about 70,000?
22      A.   70,000 plus or minus.
23      Q.   Okay.
24      A.   I know we -- we put out some
25   advertisements to find joint venture partners.
```

Page 34

STEPHEN J. GARCHIK

And that was $30,000.
    I know we began the relationship with Bungalow.  That was to be roughly another 100-plus thousand dollars.  I know there were legal -- some legal fees in there and other miscellaneous expenses.  So I don't know what that all adds up to, but at a minimum, it that was amount of money.
Q.   Those would be the -- made the material categories?
    MR. MAGLIERY:  Objection.
A.   The ones I remember.
Q.   Okay.  And the legal expenses would be in those financial documents that you produced?  Those expenditure reports?
    MR. MAGLIERY:  Objection.
    You don't have to testify about the document if you don't remember it.
Q.   You remember that you produced documents to your lawyers that reflect how much you spent other business in a given year?
A.   Yes.
Q.   And the legal expenses would be included in there?
A.   Any expense --

Page 35

STEPHEN J. GARCHIK

Q.   Okay.
A.   -- related to that would be included.
Q.   Got it, that's helpful.
    And just briefly with respect to SM Kids, how much revenue has SM Kids earned from the GOOGLES business since its formation earlier this year?
    MR. MAGLIERY:  Objection.
A.   I don't -- I don't recall.
    MR. MAGLIERY:  Objection.
Q.   More than a hundred dollars?
A.   I honestly don't recall.
Q.   More than $10?
A.   I don't recall.
Q.   And what has SM Kids' expenditures been since its formation earlier this year?
    MR. MAGLIERY:  Objection.
A.   You're asking me by category?  By dollar amount?
Q.   No, dollar amount.  Dollar amount.
A.   Well, I don't remember the amounts.
Q.   ==Just roughly how much has SM Kids spent on the business since February of this year when it was formed?==

Page 36

STEPHEN J. GARCHIK

A.   Was that one of the documents we provided?
Q.   I'm not remembering anything.
A.   Then I'd have to check.
Q.   Do you know whether SM Kids has had even a dollar of revenue this year?
A.   I know we've sold hats and shirts this year.
Q.   On the Peace Love Solve website?
A.   On the Peace Love Solve website.
Q.   But you don't know whether any money has been remitted by the Peace Love Solve website?
A.   I don't know if it has and I don't know, you know, what schedule it follows to do that.
Q.   And you don't know whether there's any profit on the sales on the Peace Love Solve website?
A.   I don't know if the cost of the shirt was less or more than the sales price of the shirt.
Q.   Right, right.
    So -- so you don't know whether there was any profit to be remitted pursuant to that

Page 37

STEPHEN J. GARCHIK

understanding between SM Kids and Peace Love Solve, correct?
    MR. MAGLIERY:  Objection.
A.   I -- I don't know if there was any or not any.
Q.   And when you refer to that understanding between either SJM or SM Kids and Peace Love Solve, you're really referring to an understanding between you and your wife, correct?
    MR. MAGLIERY:  Objection.
A.   My wife controls Peace Love Solve, so she and I would talk about it.  She and I would be the ones to talk about it.
Q.   And this understanding that you're describing, is that an understanding that arises from an explicit conversation or it's just an understanding that you think exists, but there may or may not have been a conversation about it?
    MR. MAGLIERY:  Objection.
Q.   Let me put it this way:  Was there a conversation about that understanding?
A.   There was a conversation about the understanding.
Q.   And when was that conversation?

Page 82

```
 1            STEPHEN J. GARCHIK
 2   the time of the Stelor bankruptcy?
 3       A.   I really don't.
 4       Q.   Okay.  Let me ask you about a specific
 5   piece of information in here.
 6            Let me ask you to turn to page -- you
 7   know what?  I'm going to come over and help you
 8   find it because I think it will be easier.
 9       A.   Thank you.
10       Q.   I'm going to ask you about this page
11   here.  It says, document 1710, page 1 of 9,
12   statement of financial affairs.
13            MR. MAGLIERY:  1710.
14            MR. SHAPIRO:  It's right here.
15            MR. MAGLIERY:  Page 2 of 9.
16            MR. SHAPIRO:  It's this right here.
17            MR. MAGLIERY:  Okay.
18            And, Ian, it looks like this is a few
19   filed documents that are put together.  Is
20   that right?
21            MR. SHAPIRO:  I didn't think so but --
22   because they all say document 17 --
23            MR. MAGLIERY:  Okay.
24            MR. SHAPIRO:  -- slash 10 at the top.
25   Maybe I don't -- yeah.  So it's -- it's all
```

Page 83

```
 1            STEPHEN J. GARCHIK
 2   document 17 and then it has --
 3            MR. MAGLIERY:  Okay.
 4            MR. SHAPIRO:  -- subparts, apparently.
 5   BY MR. SHAPIRO:
 6       Q.   So, Mr. Garchik, I wanted to ask you
 7   specifically about Section 1 on this page, which
 8   refers to income from employment or operations of
 9   business.
10            And -- and I'm not asking you to
11   interpret this document.  I'm going to ask you
12   what you recall and whether or not you recall
13   anything different from what's reflected in this
14   document.
15            It says that in 2009, Stelor
16   Productions had $625 in revenue as of the date of
17   this filing.
18            Do you see that?
19       A.   Subscription revenue.
20       Q.   Right.
21       A.   I see that.
22       Q.   Do you have any reason to believe that
23   Stelor had anything more than $625 in revenue in
24   that year?
25       A.   I don't know.
```

Page 84

```
 1            STEPHEN J. GARCHIK
 2       Q.   And aside from what's written here, do
 3   you independently know what was the source of
 4   Stelor Productions' revenue in 2009?
 5       A.   I would not.
 6       Q.   Okay.  And then we come to 2008, where
 7   their -- where Stelor Productions has $634 in
 8   revenue.
 9            Do you see that?
10       A.   Yes, sir.
11       Q.   And that overlaps with the period of
12   time when you were briefly acting CFO, correct?
13       A.   I don't believe so.
14       Q.   You don't believe that your --
15       A.   I don't see I was an acting CFO at any
16   time in '18.
17       Q.   In -- in '08?
18       A.   '08, excuse me.
19       Q.   Okay.  So that the -- the period that
20   you were acting CFO would have been entirely in
21   2007?
22       A.   That's my recollection.
23       Q.   Okay.  But -- but you were a director
24   for part of 2008, correct?
25       A.   I was.
```

Page 85

```
 1            STEPHEN J. GARCHIK
 2       Q.   And do you have any understanding as
 3   to the source of that is $634 in revenue?
 4       A.   Other than what it says.
 5       Q.   Other than what it says, do you
 6   independently have any understanding of how Stelor
 7   Productions earned $634 in income in 2008?
 8       A.   No.
 9       Q.   Do you have any understanding as to
10   which products or services or anything else it
11   related to?
12       A.   No, I do not.
13       Q.   Okay.  And then we come to 2007 which
14   that overlaps, in part, with the period in which
15   you were acting CFO.
16            Do you have any understanding as to
17   the source of that $643 in income?
18            MR. MAGLIERY:  Objection.
19       A.   No, I don't.
20       Q.   And do you have any basis for
21   contending that any of the amounts reflected on
22   this page for 2007, 2008 and 2009 are inaccurate?
23       A.   I have a question.  But I don't know
24   who I'd get to ask it of.
25       Q.   Well, is it a question -- is it a
```

Page 110

1        STEPHEN J. GARCHIK
2     A.   -- to pursue the plan.
3     Q.   And when you refer to recouping the
4  original loan proceeds for the StelPro Investors,
5  what -- what amount were you hoping to recoup at
6  that point in time?
7          MR. MAGLIERY:  Objection.
8     Q.   What was the hole that you were trying
9  to make up?
10    A.   It says "original loan proceeds."
11    Q.   Right.
12    A.   So however that amount was.
13    Q.   Do you know what it was?
14    A.   I think you asked me earlier if it was
15 around $3 million and I said I didn't remember --
16 remember.
17    Q.   Okay.
18    A.   It's definitely on some piece of paper
19 here.
20         MR. SHAPIRO:  Okay.  Let's take a look
21 at Tab 22.
22         We're going to mark as DX-4, a
23 document Bates stamped SMKIDS000220 through
24 232.
25         (Defendants' Exhibit 4, trademark

Page 111

1        STEPHEN J. GARCHIK
2  assignment, bearing Bates Nos. SMKIDS000220
3  through SMKIDS000232 , was marked for
4  identification at this time.)
5     Q.   What -- what is Defendants' Exhibit 4,
6  Mr. Garchik?
7     A.   One moment.  Let me look at it.
8     Q.   Sure.
9     A.   It's a trademark assignment from
10 Stelor Productions as assignor to me as trustee
11 for all the trademarks listed on Schedule 1.
12    Q.   And then do you see at the page Bates
13 stamped 228 there's a second trademark assignment
14 with a separate schedule of trademarks?
15    A.   I didn't look at that one.  I
16 apologize.
17    Q.   Okay.
18    A.   You're correct.  There's a second one
19 from Stelor assignor to me as trustee assignee for
20 a separate Schedule 1.  So there are two.
21    Q.   Right.  So let -- let me ask:  Do you
22 know why this was done in two separate
23 assignments, what the difference is between the
24 marks in the -- in the first assignment and the
25 marks in the second assignment?  Why it was done

Page 112

1        STEPHEN J. GARCHIK
2  that way?
3     A.   No, I don't know why.
4     Q.   Okay.  And were -- were you taking
5  these assignments of the trademarks as -- in your
6  own name or as a trustee for the StelPro
7  Investors?
8     A.   As trustee for the StelPro Investors
9  and myself, because I had made that one loan in my
10 name as trustee.
11    Q.   Where -- where does it -- it says,
12 "Stephen J. Garchik, Trustee."  It says that this
13 is assignment to you as trustee.  It doesn't say
14 that it's an assignment to you personally.
15         So I'm trying to understand what the
16 basis is for your testimony that this is an
17 assignment to you personally.
18         MR. MAGLIERY:  Objection.
19         If you know.
20    A.   I don't think I said it was to me
21 personally, did I?
22         I don't remember saying that.
23    Q.   I misunderstood you then.
24         So you understood that you were taking
25 these trademarks as a trustee for the StelPro

Page 113

1        STEPHEN J. GARCHIK
2  Investors?
3          MR. MAGLIERY:  Objection.
4          He said StelPro and himself.
5     A.   As trustee.
6     Q.   So you were a trustee for yourself --
7     A.   The title to the note said what -- the
8  lender was Stephen J. Garchik, Trustee, even
9  though I had lent the money.
10    Q.   I see.
11    A.   So on behalf of Stephen J. Garchik,
12 Trustee, and as trustee for the two StelPro
13 entities, I was taking title --
14    Q.   So --
15    A.   -- as assignee.
16    Q.   So even in the case where you made the
17 loan individually, you were the trustee on that
18 note?
19    A.   Yes.
20    Q.   I got it.
21         And -- okay.  And did you then make
22 arrangements to have the trademarks assigned to
23 StelPro Investors?
24         MR. MAGLIERY:  Objection.
25    Q.   Or was it your understanding that as a

Page 226

1  STEPHEN J. GARCHIK
2  a different way.
3      I'm counting on Google honoring the
4  2008 agreement and staying out of the children's
5  space as the reason to making sure that my
6  business is going to be successful. That's what
7  I'm counting on.
8      Q.  I -- I have one last question on this
9  topic: When you talk to investors or potential
10 partners about the potential of the googles.com
11 website, do you discuss the proximity between the
12 GOOGLES name and the Google brand?
13     A.  Well, Bobby Friedman was tasked with
14 the responsibility to talk to those major
15 corporations.
16     Q.  And you know that he emphasizes that
17 point when he talks to investors and corporations,
18 right?
19     A.  I don't know what he says to them.
20     Q.  You have no idea?
21     A.  I'm not there.
22     MR. SHAPIRO:  We can take a short
23 break and then we'll continue.
24     VIDEOGRAPHER:  The time is 4:00 p.m.
25 We're off the record.

Page 227

1  STEPHEN J. GARCHIK
2      (Recess.)
3      VIDEOGRAPHER:  The time is 4:15 p.m.
4  We're on the record.
5      MR. SHAPIRO:  We'll mark as DX-24 a
6  document stamped SMKIDS -- 21, that's
7  right -- DX-21, a document marked SMKIDS3092
8  through 3094.
9      (Defendants' Exhibit 21, agreement,
10 bearing Bates Nos. SMKIDS3092 through
11 SMKIDS2094, was marked for identification at
12 this time.)
13 BY MR. SHAPIRO:
14     Q.  But before I ask you about this
15 document, Mr. Garchik, as of late 2013, early
16 2014, when you were parting ways with Mr. Mazer,
17 who owned the googles.com business assets?
18     A.  SJM Partners.
19     Q.  Okay. And that includes the
20 trademark?
21     A.  Yes.
22     Q.  Now, if we -- if we turn our attention
23 to DX-24 -- 21, can you tell me what DX-21 is?
24     A.  It's an agreement between Taral
25 Productions and StelPro Investors, LLC to

Page 228

1  STEPHEN J. GARCHIK
2  recognize Allan Cohen's efforts, previous and
3  going forward, and capital contributions, previous
4  and going forward, in helping build the business
5  and explains how, if receipts are received, how
6  they'd be shared and that we would have joint
7  decision-making with respect to major decisions
8  that we made going forward.
9      Q.  Now, do you have any explanation as to
10 why the assignment is from StelPro Investors, LLC
11 rather than SJM Partners?
12     MR. MAGLIERY:  Objection.
13     A.  Well, my -- my explanation is that I
14 didn't do a good job of reading the document when
15 it was prepared and should have caught that.
16     Q.  And who is your lawyer when this
17 document was prepared?
18     A.  I didn't have a lawyer.
19     Q.  Did Allan Cohen have a lawyer?
20     A.  Allan Cohen had a lawyer.
21     Q.  And who was Allan Cohen's lawyer?
22     A.  This Mr. Wyman.
23     Q.  Of a Davis, Wright & Tremaine?
24     A.  Well, back then, it was Wyman &
25 Isaacs.

Page 229

1  STEPHEN J. GARCHIK
2      Q.  I see.
3          And in this agreement, you're
4  assigning 50 percent of the GOOGLES IP to Taral,
5  right?
6      A.  I agree to assign, grant, and set over
7  to Taral an undivided one-half interest in the
8  property. That's what it says.
9      Q.  And Taral is Allan Cohen's company?
10     A.  Taral is Allan Cohen's company.
11     Q.  Okay. And the 50 percent assignment
12 includes the domain name and the trademarks,
13 correct?
14     A.  It would.
15     Q.  Okay. And it did, right?
16     A.  Well, this agreement expired by its
17 terms.
18     Q.  It expired after 18 months?
19     A.  Yes --
20     Q.  Okay.
21     A.  -- so it never happened, but it would
22 have.
23     Q.  Well, for the 18 months before it
24 terminated, wasn't it in effect?
25         Wasn't -- wasn't this agreement

Page 230

```
 1              STEPHEN J. GARCHIK
 2   effective for the 18 months until it terminated?
 3         MR. MAGLIERY:  Objection.
 4         A.   The agreement was effective, I believe
 5   you're right, that the agreement would be
 6   effective until it terminated.
 7         Q.   Right.  So let me direct your
 8   attention to Section 7, and clarify that it
 9   terminates after two years, correct?
10         A.   Yes.
11         Q.   Okay.  So for two years, from
12   February 6, 2014 to February 6, 2016, Allan Cohen
13   through Taral Productions owned half of the Google
14   IP, correct?
15         MR. MAGLIERY:  Objection.
16         A.   Okay.  The way paragraph 1 reads,
17   "StelPro hereby agrees to assign and grant over to
18   Taral an undivided one-half interest in the
19   property, including the rights and benefits of
20   StelPro under the settlement agreement."  Okay?
21         Saying I agree to do it.  I never
22   formally executed any papers that effectuated
23   that.
24         Q.   Doesn't it say you hereby agree to
25   assign?
```

Page 231

```
 1              STEPHEN J. GARCHIK
 2         A.   Well, it says, I agree to.
 3         Q.   I see.
 4         So your testimony is that --
 5         A.   If it said, "As hereby assigns," then
 6   it would be different.  But it says, "Hereby
 7   agrees to assign."
 8         Q.   I see.
 9         And so your belief is that Allan Cohen
10   through Taral never became a 50 percent owner of
11   the GOOGLES business?
12         A.   That is my belief.
13         Q.   And is that what Allan Cohen believes?
14         MR. MAGLIERY:  Objection.
15         A.   Well, I don't -- I don't know what he
16   believe.
17         Q.   You've never discussed with him
18   whether or not he was a part owner of the business
19   for a period of time?
20         A.   We -- all our discussions have been
21   irrespective of these documents.  It's just been
22   working together to make something happen.
23         Q.   Did he ever convey to you during this
24   two-year period that he understood himself to be a
25   part owner of the GOOGLES mark?
```

Page 232

```
 1              STEPHEN J. GARCHIK
 2         A.   I don't recall.
 3         Q.   And so explain to me again, is it your
 4   view that notwithstanding your execution of this
 5   agreement, that the -- the assignment of the
 6   50 percent of the GOOGLES IP pursuant to this
 7   agreement would not be effective unless and until
 8   you entered into separate agreements assigning
 9   that IP?
10         MR. MAGLIERY:  Objection.
11         A.   As a businessperson reading this
12   document, I don't believe it would be effective
13   unless I formally assigned it to him.
14         Q.   And what would that formal assignment
15   consist of?
16         A.   It would be similar to the assignments
17   that we've looked at earlier today from me to
18   whomever, StelPro to whoever kind of thing.
19         Q.   And what's the difference between
20   those formal assignment agreements that we've
21   looked at throughout the day and this assignment
22   agreement?
23         MR. MAGLIERY:  Objection.
24         A.   To me, the word "hereby agrees to,"
25   that's the difference.
```

Page 233

```
 1              STEPHEN J. GARCHIK
 2         Q.   And did you discuss --
 3         A.   And --
 4         Q.   -- that with Allan Cohen at the time
 5   you entered into this agreement?
 6         A.   His lawyer drafted this and I signed
 7   it.
 8         Q.   And is it your testimony that at the
 9   time you signed this agreement you believed you
10   were still the 100 percent owner the GOOGLES IP?
11         A.   Yes, it is my testimony.
12         Q.   Okay.  And -- and you believed in
13   February of 2014 that before and after signing
14   this document, you remained the 100 percent owner
15   of the GOOGLES IP, including the trademark?
16         A.   Yes.
17         Q.   And you've never discussed that one
18   way or another with Allan Cohen?
19         A.   To my knowledge, it's never come up.
20         Q.   So what was -- what was in it for
21   Allan Cohen in this agreement?  What was Allan
22   Cohen getting if he wasn't getting 50 percent of
23   the GOOGLES IP?
24         A.   Allan was getting the same thing that
25   he ultimately got in the successive agreements,
```

Page 234

```
1              STEPHEN J. GARCHIK
2    which Bungalow got in successive agreements, which
3    is in return for efforts and capital the right to
4    enjoy the benefits that come from the business if
5    and when it was commercially successful.
6        Q.   And --
7        A.   A profits interest.
8        Q.   -- what had Allan Cohen contributed
9    economically as of the date of this agreement?
10          MR. MAGLIERY:  Objection.
11       A.   "Economically" to you means money?
12       Q.   Money.  How much did he spend on the
13   business as of the date of this agreement?
14       A.   I don't know.
15       Q.   And how much did he spend after the
16   date of this agreement?
17       A.   Going how far out?
18       Q.   In the two --
19       A.   To today?
20       Q.   No, in the two years that this
21   agreement was in effect, how much did Allan Cohen
22   spend on the business?
23       A.   All I know is he spent more from the
24   date of the agreement to the end of it, but I
25   don't know how much total he spent.
```

Page 235

```
1              STEPHEN J. GARCHIK
2        Q.   Well, earlier, you were talking about
3    the fact that he had made contributions before and
4    after this agreement, and so I'm just trying to
5    get a sense of how much money he had spent or put
6    into the business.
7        A.   I appreciate that, but I don't
8    remember how much.
9        Q.   And paragraph 4 has an allocation of
10   proceeds which at a certain point entitles you to
11   $3-and-a-half million after each party had
12   recouped its expenses, correct?
13       A.   Yes, sir.
14       Q.   And am I correct that the
15   $3-and-a-half million roughly corresponds to
16   the -- the StelPro loans and the amounts that you
17   had spent in the bankruptcy and thereafter since
18   2011, is that how you came up with the
19   3-and-a-half million?
20       A.   That was my --
21          MR. MAGLIERY:  Objection.
22          Go ahead.
23       A.   I'm sorry.  Repeat the question.
24       Q.   Am I correct that the 3-and-a-half
25   million represents the amount of the unrecovered
```

Page 236

```
1              STEPHEN J. GARCHIK
2    loan and the amount that you had spent on the
3    foreclosure and bankruptcy litigation, and then
4    the amounts that you had spent on the GOOGLES
5    business since 2011, isn't that how you came up
6    with the 3-and-a-half million?
7        A.   It -- it was an approximation of the
8    original principal of the loans and the funds I
9    had spent subsequent to that date.
10       Q.   And the funds that you had spent
11   subsequent on that date would be the funds you
12   spent on the litigation and the funds that you had
13   spent on the business since 2011, correct?
14          MR. MAGLIERY:  Objection.
15       A.   Well, it was the fund -- funds I spent
16   on litigation, Matt Mazer, those funds, the ones
17   we've talked about previously, any other
18   obligations I had by virtue of the business, any
19   taxes that were due by virtue of the business.  So
20   anything that I wrote a check for related to the
21   business --
22       Q.   Okay.
23       A.   -- approximately.
24       Q.   Okay.  And then you subsequently
25   assigned 10 percent of the GOOGLES IP to someone
```

Page 237

```
1              STEPHEN J. GARCHIK
2    named Jared Lader, correct?
3        A.   Lader.
4          MR. MAGLIERY:  Objection.
5        Q.   Lader.
6        A.   Excuse me.  I didn't.
7        Q.   Who did that?
8        A.   I assigned 5 percent --
9        Q.   Right.  And Allan --
10       A.   -- to the business.
11       Q.   -- and Allan Cohen assigned --
12       A.   Allan Cohen assigned 5 percent.
13       Q.   How did Allan Cohen assign 5 percent
14   if he actually didn't receive 50 percent?
15       A.   Well, I don't know.  I don't have the
16   document in front of me.  Did he assign it in the
17   business or of the profits interest?
18          MR. SHAPIRO:  Well, why don't we mark
19      Tab 58 as DX-22.
20          (Defendants' Exhibit 22, document, was
21      marked for identification at this time.)
22   BY MR. SHAPIRO:
23       Q.   I see.  So -- so your testimony is
24   that Jared Lader was accorded a share of the
25   proceeds, but not an interest in the IP.  Is that
```

Page 238

STEPHEN J. GARCHIK
right?
     MR. MAGLIERY: Objection to form.
     A.  Well, I don't have to testify.  The agreement says specifically that paragraph 4C is hereby deleted and replaced with the following: 45 percent to Taral, 45 percent to StelPro, and 10 percent to Jared.  And 4C deals with only proceeds derived from the property --
     Q.  Okay.
     A.  -- out of the sale.
     Q.  Got it.
         And who's Jared Lader?
     A.  Jared Lader is Allan Cohen's right-hand man.
     Q.  Okay.  Is he related to him?
     A.  No.
     Q.  And why did Allan -- why did Allan Cohen want to give 10 percent of the proceeds to Jared Lader?
     A.  He -- he asked Jared -- he has asked and continues to ask Jared to do all sorts of work on our collective behalf, research and other things, related to the website, the business, and the interactions with Mazer, Bungalow, and the

Page 239

STEPHEN J. GARCHIK
like.
     Q.  Has Jared Lader produced any creative content for the business?
     A.  He has -- no, I don't believe he's produced any creative content.
     Q.  Okay.
         Just -- just so I have some sense of it, what -- what in your mind is the most important thing Jared Lader has done for the business?
     A.  He's -- the most important thing he's done?
     Q.  Yeah.
     A.  He's cataloged everything that we've sent him to put like on disks and things.  So like for Bobby Friedman needed information at Bungalow, he put it all together.  He put all the documents together.  Tammy didn't do it.
     Q.  Okay.
     A.  Jared did it.
         So he responded to those requests.  He helped us put the ads together that we sent out looking for the venture partners when we did that.  He -- what else did he do?  He --

Page 240

STEPHEN J. GARCHIK
     Q.  **When did you go out and look for venture partners?**
     A.  Whenever -- there's an e-mail in there somewhere showing the ad that we put out in the marketplace.
     Q.  Okay.
     A.  But it was before Bobby Friedman.
     Q.  And did you get any interest?
     A.  We didn't get any serious interest.  We got interest.
         So -- but I mean, he did recordkeeping, keeping track of stuff, and Allan was fond of him, and Allan came to me with a request and I agreed.
     Q.  **And -- and why did none of the venture investors ultimately invest in the business?**
     A.  The ones that responded?
     Q.  Yeah.
     A.  Most of them were not what you would consider to be -- they were mom and pops that responded to the ads.  They weren't big entities.  They didn't have the means.
         So they would like to have done it, but they didn't have the means.

Page 241

STEPHEN J. GARCHIK
     Q.  I see.
         Any other reasons?
     A.  That was the primary one.
     Q.  Okay.
         MR. SHAPIRO:  I'm going to mark as DX-22 -- 23, a screenshot of the GOOGLES website as of January 2015.
         (Defendants' Exhibit 23, screenshot, was marked for identification at this time.)
BY MR. SHAPIRO:
     Q.  Mr. Garchik, DX-23 is the website as of January 2015.
         Do you see that?
     A.  Where is that date?
     Q.  It's on the top there.  It's a little bit hard to read.
         Do you see it says January 4, 2015?
     A.  I need better glasses.
         Is that what it says?
     Q.  Yes.
     A.  Okay.
     Q.  **Yeah.  And do you see that -- that -- that -- that at this point in time, you're using the website to solicit investors and content**

61

```
                                                      Page 254
 1              STEPHEN J. GARCHIK
 2   and services considered to be -- maybe this is
 3   what you were explaining a moment ago, but how was
 4   producing products and services related to
 5   soliciting a sale, joint venture or other capital
 6   infusion?
 7        MR. MAGLIERY:  Objection.
 8        A.   Anyone soliciting money for a business
 9   has a business plan.  And the more detailed the
10   plan can be, the easier it is to make a
11   determination as to whether it's something an
12   institution would want to invest in or not.
13             So we charged Bobby Friedman with the
14   responsibility to put together sufficient
15   material, products and services, sufficient
16   material, to ensure that when he went out, that he
17   would get, you know, serious inquiries and
18   hopefully a successful response.
19        Q.   So you're not talking about a business
20   plan there, although that may have been part of
21   it.  You wanted him to create enough content so
22   that you had something to show to potential
23   investors.
24        A.   Both content and related services that
25   the website would be responsibility for, yes.
```

```
                                                      Page 255
 1              STEPHEN J. GARCHIK
 2        Q.   What kind of services do you mean?
 3        A.   Just his ideas about ad revenue,
 4   sources of revenue that would come in, where it
 5   would be on the website, how it would be
 6   solicited.
 7        Q.   I see.  And -- and --
 8        A.   Anything required -- sorry for
 9   interrupting.
10        Q.   That's okay.  Go ahead.
11        A.   I mean, he had a pro forma, okay?  He
12   had -- so he had to be able to explain this amount
13   of revenue is coming from here, and that's what he
14   was tasked with doing.
15        Q.   Okay.  And -- and he was also tasked
16   with creating creative content that would define
17   the new website, correct?
18        A.   Based on his research of the
19   children's space at that time.
20        Q.   Okay.  And he charged $200,000 to do
21   this work?
22        MR. MAGLIERY:  Objection.
23        A.   He budgeted roughly $200,000 to put
24   the live-action production together.  I don't
25   recall exactly how much we ended up spending, but
```

```
                                                      Page 256
 1              STEPHEN J. GARCHIK
 2   that was his budget at the time.
 3        Q.   Was it more or less than 200,000?
 4        MR. MAGLIERY:  Objection.
 5        A.   Well, it was not exactly $200,000.
 6   That much I remember.
 7        Q.   Okay.  But was it in that
 8   neighborhood?
 9        A.   It was in the neighborhood, but it was
10   not exactly.
11        Q.   How much of the 200,000 did you pay?
12        A.   Half.
13        Q.   And Allan Cohen paid the other half?
14        A.   Taral paid the --
15        Q.   Taral paid the other half.
16        A.   Yes.
17        Q.   And if you look at Section 4, in this
18   agreement your -- your separate recoupment has
19   been reduced from 3 and a half million dollars to
20   a million dollars, do you see that?
21        A.   Yes, sir, I do.
22        Q.   Why had your entitlement to additional
23   recoupment come down so dramatically?
24        MR. MAGLIERY:  Objection.
25        A.   The terms of this document were
```

```
                                                      Page 257
 1              STEPHEN J. GARCHIK
 2   negotiated between the parties and this is what
 3   the conclusion was.
 4        Q.   Okay.  Understood.
 5             Section 7 of this agreement says that
 6   it terminates after 18 months.
 7             Do you see that?
 8        A.   Hold on.  That's another page.
 9        Q.   Okay.
10        A.   Yes, sir.
11        Q.   Has this agreement been terminated or
12   modified?
13        MR. MAGLIERY:  Objection.
14        A.   You're asking two things or one thing?
15        Q.   No, let me start -- let me start --
16   let me start over.
17             Eighteen months have passed since the
18   date of this agreement, correct?
19        A.   Yes.
20        Q.   What happened to this agreement at the
21   end of 18 months?
22        A.   It terminated.
23        Q.   Okay.  And if you look at the end of
24   paragraph 7 it says that, "After this agreement
25   terminates, Bungalow's interest shall revert to
```