# EXHIBIT C
# REDACTED



Deposition of:
# Robert Friedman

*January 18, 2021*

In the Matter of:

# SM Kids LLC v. Google LLC

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - -x
 4     SM KIDS, LLC            :
 5         Plaintiff           :
 6         v.                  :  Civil Action No.
 7     GOOGLE, LLC, et al.     :  1:18-cv-02637-LGS
 8         Defendants          :
 9   - - - - - - - - - - - - -x
10
11
12
13                         - - -
14              Monday, January 18, 2021
15                         - - -
16
17
18
19   REMOTE ZOOM AUDIO/VIDEO deposition of ROBERT
20   FRIEDMAN, beginning at 10:02 a.m., before
21   Christina S. Hotsko, RPR, CRR, when were present on
22   behalf of the respective parties:
```

Page 2

1       A P P E A R A N C E S  (Via Zoom)
2   On behalf of Plaintiff:
      JOHN M. MAGLIERY, ESQUIRE
3     Davis Wright Tremaine, LLP
      1251 Avenue of the Americas  21st Floor
4     New York, New York 10020-1104
      (212) 603-6422
5     johnmagliery@dwt.com
6
    On behalf of Defendant:
7     CHARLIE LOW, ESQUIRE
      IAN SHAPIRO, ESQUIRE
8     Cooley, LLP
      55 Hudson Yards
9     New York, New York 10001-2157
      (212) 479-6859
10    chlow@cooley.com
      ishapiro@cooley.com
11
      JANE VAN BENTEN, ESQUIRE
12    Cooley, LLP
      1299 Pennsylvania Avenue, Northwest, Suite 700
13    Washington, D.C. 20004
      (202) 728-7106
14    jvanbenten@cooley.com
15
    ALSO PRESENT:
16    Samuel Francis, Video Technician
      Matthew Riesdorph, Veritext
17
18
19
20
21
22

Page 3

1           C O N T E N T S
2   EXAMINATION BY:                        PAGE
3     Counsel for Defendants            06
4     Counsel for Plaintiff             216
5
6   FURTHER EXAMINATION BY:                PAGE
7     Counsel for Defendant             224
8
9
10  FRIEDMAN DEPOSITION EXHIBITS:         MARKED
11  Exhibit 100   Friedman Wikipedia Page    10
12  Exhibit 101   E-mail Chain              27
13  Exhibit 102   Googles Manifesto, Version 12,   38
                  18 May 2016
14
    Exhibit 103   Googles Agreement, 30 June 2016  41
15
    Exhibit 104   Googles Agreement, March 2018    61
16
    Exhibit 105   Googles Discussion                68
17                Presentation, 1 Sept 2016
18  Exhibit 106   Googles Show Creative             83
19  Exhibit 107   E-mail Chain                      86
20  Exhibit 108   E-mail Chain                      92
21  Exhibit 109   Googles Budget, Sizzle, and      100
                  Discussion
22

Page 4

1   FRIEDMAN DEPOSITION EXHIBITS:         MARKED
2   Exhibit 110   Googles.com Content,      112
                  November 2016
3
    Exhibit 111   E-mail Chain              119
4
    Exhibit 112   E-mail Chain              122
5
    Exhibit 113   Final Googles Investor Package  126
6
    Exhibit 114   Googles.com Proposal      135
7
    Exhibit 115   Googles Press Release Draft  137
8
    Exhibit 116   E-mail Chain              146
9
    Exhibit 117   E-mail Chain              153
10
    Exhibit 118   E-mail Chain              155
11
    Exhibit 119   E-mail Chain              163
12
    Exhibit 120   E-mail Chain              167
13
    Exhibit 121   E-mail Chain              169
14
    Exhibit 122   E-mail Chain              185
15
    Exhibit 123   E-mail Chain              186
16
    Exhibit 124   E-mail Chain              198
17
    Exhibit 125   E-mail Chain              206
18
19
20
21      (Exhibits attached to transcript.)
22

Page 5

1           P R O C E E D I N G S
2       VIDEO TECHNICIAN:  Good morning.  The
3   time now is 10:02 a.m.  We're going on the record
4   on January 18th, 2021.
5       This is the remote recorded deposition of
6   Mr. Robert Friedman taken in the matter of
7   SM Kids, LLC, versus Google, LLC, et al., filed in
8   the United States District Court, Southern
9   District of New York, case number 1:18-cv-02637.
10      My name is Samuel Francis from the firm
11  Veritext Legal Solutions.  The court reporter is
12  Christina Hotsko from the firm Veritext Legal
13  Solutions.
14      Will counsel please state their
15  appearances and affiliations for the record.
16      MR. SHAPIRO:  Ian Shapiro and Charlie Low
17  of Cooley, LLP, for the defendants.
18      MR. MAGLIERY:  Is Jane on also?  Is she
19  making an appearance?
20      MR. SHAPIRO:  Oh, sure.  And Jane
21  van Benten for Cooley.
22      MR. MAGLIERY:  And it's John Magliery,

Page 26

1  Q. Do you recall how many there were?
2  A. No.
3  Q. And do you recall how long they were?
4  A. I don't.
5  Q. Do you recall reviewing anything else?
6  A. In the context of --
7     MR. MAGLIERY: Objection to form.
8     THE WITNESS: -- content?
9  BY MR. SHAPIRO:
10 Q. In the context of what?
11 A. Are you asking in terms of the context of
12 content, i.e., gaming and animations, or anything
13 else?
14 Q. Yeah. Any other content associated with
15 the website as it existed in 2008 --
16 A. There were --
17 Q. -- or as -- associated with the business
18 in 2008.
19 A. Sure. There were a few things sent to
20 me; I just don't remember what they were, whether
21 they were T-shirts or items for sale.
22 Q. Okay. And those animated videos you

Page 27

1  described, did they have music in them?
2  A. Yes.
3     MR. SHAPIRO: Let's mark as Defendants'
4  Exhibit 101 an e-mail Bates stamped 9875 through
5  9876.
6     (Friedman Deposition Exhibit 101 marked
7      for identification and attached to the
8      transcript.)
9  BY MR. SHAPIRO:
10 Q. And you can let me know when you've had a
11 chance to receive it and review it, Mr. Friedman.
12    MR. RIESDORPH: And Mr. Friedman, that
13 marked exhibit folder on the left-hand side, if
14 you just click that, it will refresh it for you
15 once it's been loaded.
16    THE WITNESS: All right. And now I
17 should just move this over, right? And just
18 open -- and I should open the exhibit?
19 BY MR. SHAPIRO:
20 Q. Yes.
21 A. It's coming up as Wikipedia.
22    MR. MAGLIERY: Another one will go in

Page 28

1  there in a minute.
2     THE WITNESS: Okay. I'm sorry.
3     MR. MAGLIERY: Charlie will tell us when
4  it's loaded.
5     MR. LOW: It's loaded.
6     MR. MAGLIERY: Okay. So now press the
7  marked exhibit folder again.
8     THE WITNESS: Okay. And I'm going to
9  open that up.
10    MR. MAGLIERY: Yep.
11    THE WITNESS: Okay. Stephen Garchik to
12 Robert Friedman. Okay. I have it in front of me.
13 BY MR. SHAPIRO:
14 Q. And let me know when you've had a chance
15 to read the e-mail chain, and then I'll ask you
16 some questions about it.
17 A. Okay. I've got it. I've read it.
18 Q. Do you see that the first sentence says,
19 "I just wanted to update you on where we are on
20 our proposal"?
21 A. Yes.
22 Q. Do you see that?

Page 29

1  A. Yes.
2  Q. What were you asked to prepare a proposal
3  for?
4  A. The proposal was to reskin and evolve
5  what was currently the website. So the first part
6  of the proposal, if I remember correctly, was to
7  develop a positioning paper, if you will, on what
8  this new content and platform would look like.
9     MR. SHAPIRO: Can you read back that
10 answer, Christina?
11    (The reporter read the record as
12     requested.)
13 BY MR. SHAPIRO:
14 Q. What do you mean by reskin the website?
15 A. In other words, in looking at it, to be
16 perfectly honest, we didn't think it was great and
17 contemporary. So our proposal was what we would
18 do to make it such.
19 Q. And this plan to reskin the website was
20 for the purpose of presenting to investors,
21 platforms, and potential media partners; is that
22 correct?

8 (Pages 26 - 29)

Page 30

1    MR. MAGLIERY: Objection.
2    THE WITNESS: Well, the first step was to
3 share our plan with Steve, because he was going to
4 be funding this himself.
5 BY MR. SHAPIRO:
6    Q. And then -- and then the plan would be
7 shared with investors, platforms, and potential
8 media partners?
9    A. Yes.
10   Q. And the idea was that one of those
11 investors, platforms, or potential media partners
12 could either buy the website or invest in the
13 development of the website; is that fair?
14   MR. MAGLIERY: Objection.
15   THE WITNESS: The ongoing assumption was
16 that we would produce and develop the content with
17 whichever partner we did in the same way that most
18 television is done.
19 BY MR. SHAPIRO:
20   Q. And that could also include selling the
21 website?
22   MR. MAGLIERY: Objection.

Page 31

1    THE WITNESS: It was not discussed in
2 terms of selling the website. It was looking at a
3 partner to fund it. What rights they would have
4 as opposed to what rights we would have had not
5 been discussed at that point until we had the
6 discussions with them.
7 BY MR. SHAPIRO:
8    Q. If you look at the third sentence it
9 says, "We have developed our go-forward strategy
10 on what to include in the presentation to
11 investors, platforms, and potential media partners
12 who may also represent buyers."
13   Do you see that?
14   A. Yes.
15   Q. Wasn't a sale of the website one of the
16 options on the table?
17   MR. MAGLIERY: Objection.
18   THE WITNESS: I'm trying to understand,
19 you know, your question.
20   A buyer would still need someone to
21 produce the content. So the ingoing assumption
22 was that is that we would develop that. You know,

Page 32

1 how much of that investment or how much of equity
2 they would own, really, at this stage it was too
3 early to decide. It's as if you were going in
4 with a television series or a movie to a network.
5 They may say, I'm willing to put up half or I'm
6 willing to fund it all or a whole variant, if you
7 will. So it really wasn't contemplated at this
8 point.
9 BY MR. SHAPIRO:
10   Q. And was the development of the
11 presentation to investors, platforms, and
12 potential media partners for the purpose of
13 attracting a party that would fund the development
14 of the content for the new reskinned website?
15   A. Yes.
16   MR. MAGLIERY: Objection. Sorry.
17 BY MR. SHAPIRO:
18   Q. And who is Karen Salmansohn?
19   A. Karen was the woman that Garchik and
20 Allan had worked with early on on some of the
21 development of this. And they decided -- and
22 asked us if we would speak with her to see whether

Page 33

1 it made sense for her to continue in some form on
2 the group that we put together to move forward.
3    Q. And had you worked with Karen Salmansohn
4 before?
5    A. No.
6    Q. And what did you decide with respect to
7 whether or not you would work with Karen
8 Salmansohn going forward?
9    A. We thought that she had some interesting
10 creative instincts. We thought that she could
11 work with us on the go-forward. But there were
12 business reasons why we decided not to go forward
13 with her.
14   Q. And what were those business reasons?
15   A. Her role was to be a work-for-hire role
16 to come up with some story, and I think her
17 expectation was that her role would be greater
18 than that, either as an equity partner or
19 something else.
20   Q. And this e-mail is dated April 2016.
21 With -- in relation to this e-mail, when did your
22 relationship with Mr. Garchik and Mr. Cohen in

9 (Pages 30 - 33)

Page 34

1  connection with the Googles.com website begin?
2      MR. MAGLIERY:  Objection.
3      THE WITNESS:  We began talking to them
4  probably a couple of years before this, even,
5  general discussions about this.
6  BY MR. SHAPIRO:
7      Q.  And what, if any, services did Bungalow
8  provide a couple of years earlier?
9      MR. MAGLIERY:  Objection.
10     Go ahead.
11 BY MR. SHAPIRO:
12     Q.  Let me walk you -- let me -- let me ask
13 you the question this way.
14     A.  Sure.
15     Q.  Beginning in 2014, when you recall the
16 relationship beginning, what, if anything, had
17 Bungalow done between 2014 and 2016, April of
18 2016, when you're being asked to put together a
19 proposal?
20     A.  I'm not a hundred percent sure.  We had
21 done up a positioning document with them, but I'm
22 not sure where that fell.  I just don't recall

Page 35

1  timing-wise.  But we were talking a lot about
2  this.  This was the formal sort of go-forward in
3  terms of what we would provide in terms of content
4  and other things.
5      Q.  Do you recall anything concrete that was
6  provided to Mr. Garchik or Mr. Cohen relating to
7  the Googles.com website before April of 2016?
8      MR. MAGLIERY:  Objection.
9      THE WITNESS:  I don't recall the exact
10 date, as I said, and I'll say it again.  We had
11 done a positioning document for them.  I'm not
12 sure where that fell --
13 BY MR. SHAPIRO:
14     Q.  Okay.
15     A.  -- timing-wise.
16     Q.  Are you referring to the Googles
17 manifesto?  Is that the positioning document?
18     A.  Yes.
19     Q.  Okay.  In addition to the Googles
20 manifesto -- and I will show you that in a few
21 moments so that you have --
22     A.  Okay.

Page 36

1      Q.  -- the timing -- do you recall any other
2  specific services that were provided to
3  Mr. Garchik and Mr. Cohen relating to the
4  Googles.com website before the spring of 2016?
5      A.  There were no paid services.
6      Q.  And with respect to unpaid services, do
7  you recall anything specific that Bungalow
8  provided to Mr. Garchik and Mr. Cohen?
9      A.  I don't recall.
10     Q.  And am I right that, as of April 9th,
11 2016, the plan was to create a presentation that
12 could be provided to investors, platforms, and
13 potential media partners?
14     MR. MAGLIERY:  Objection.
15 BY MR. SHAPIRO:
16     Q.  Is that right?
17     A.  Yes.  But the presentation would include
18 content.
19     Q.  And in addition to the presentation, you
20 were also expected to prepare a budget; is that
21 correct?
22     A.  Yes.

Page 37

1      Q.  And the budget was the budget for what?
2      A.  The budget would be over the initial
3  launch -- well, just to clarify, there was a
4  budget that we prepared for Allan and Steve to
5  actually produce the initial content that became
6  something that we put on the website.  And then
7  there was a budget that would have to be prepared
8  for the launch of this initiative that the
9  investors would participate in.
10     Q.  And for the sake of using the same terms,
11 that budget for the initial content, how did you
12 refer to that when you were talking to Mr. Garchik
13 and Mr. Cohen?
14     A.  That's the budget that's referred to
15 here.  It would cost you X number of dollars for
16 us to prepare X amount of content.  And that
17 content we would put on the website as well as use
18 it in a future presentation to investors.
19     Q.  Okay.  So that was the budget for the
20 preparation of the presentation, which included a
21 certain amount of initial content, correct?
22     A.  Yes.  Yes, it did.

10 (Pages 34 - 37)

Page 146

1  BY MR. SHAPIRO:
2    Q. Mr. Friedman, are you standing -- I can't
3  tell whether you're changing your analogy or
4  standing by your point the new Googles.com website
5  was like a new season of a TV series.
6    A. What I'm really trying to do is give you
7  Marketing 101. And why would I talk about the
8  past when I was talking about new content? And I
9  was trying to come up with analogies that might
10 make it clearer.
11      MR. SHAPIRO: Let me mark as Exhibit 116
12 an e-mail Bates stamped SMKIDS9997 through 9998.
13      (Friedman Deposition Exhibit 116 marked
14      for identification and attached to the
15      transcript.)
16      THE WITNESS: Okay. It's coming up now.
17 BY MR. SHAPIRO:
18   Q. Mr. Friedman, do you see your e-mail at
19 the top of the page to Stephen Garchik?
20   A. Yes, I do.
21 ███████████████████████████████████████

Page 147

███████████████████████████████████████
7    Q. And whenever you pitched the proposed
8  website to investors, you sent a report to
9  Mr. Garchik and Mr. Cohen, correct?
10      MR. MAGLIERY: Objection.
11      THE WITNESS: It wasn't a report.
12 Sometimes it was informal, saying, here's what we
13 did.
14 BY MR. SHAPIRO:
15   Q. But you endeavor -- what I meant is that
16 you endeavor to report back to Mr. Garchik and Mr.
17 Cohen whenever you communicated with proposed
18 partners or investors, correct?
19   A. Yeah. Yes.
20      MR. MAGLIERY: Objection.
21 BY MR. SHAPIRO:
22   Q. And here you say that you soft pitched it

Page 148

1  to the ███████?
███████████████████████████████████████
3    Q. Can you explain that to me?
4      MR. MAGLIERY: Objection.
5      THE WITNESS: My understanding of the
6  agreement that was referenced in our original
7  agreements is that they had the rights to do
8  Googles.com exclusively -- exclusively, and that
9  Googles itself would not have the rights to do
10 kids programming.
11      And when YouTube Kids was purchased, or
12 YouTube purchased by them and they launched
13 YouTube Kids, it wasn't a hundred percent clear.
14 And I certainly was not a hundred percent clear
15 whether that was an infringement upon their right,
16 though a couple of people talked about it at
17 various stages along the pitching process.
18 BY MR. SHAPIRO:
19   Q. Well, I'm just trying to understand why
20 you never went back to go see the ███████
21   A. Well, because by the time we were going
22 to go back to see ███ the question had come up



38 (Pages 146 - 149)

Page 162

1  to [sic] it or it really hadn't become an issue
2  for me.
3      And I can't remember who, but one of the
4  people we were pitching had said, oh, how is this
5  different than YouTube Kids?
6  BY MR. SHAPIRO:
7      Q. You don't remember who said that?
8      A. I don't, I'm sorry.
9      Q. So someone brought YouTube Kids to your
10 attention --
11     A. Yes.
12     Q. -- in this context, and you weren't aware
13 of YouTube Kids at the time?
14         MR. MAGLIERY:  Objection.
15         THE WITNESS:  Well, I was aware that
16 YouTube Kids existed, but I wasn't exactly sure
17 what they were doing.  That's what I'm referring
18 to when I talk about the timeline, exactly when I
19 realized that this would be of some concern to me
20 after it was brought to my attention.
21         (Discussion off the record.)
22         MR. SHAPIRO:  Let's mark as Exhibit 119

Page 163

1  an e-mail Bates stamped 17444 through 17445.
2         (Friedman Deposition Exhibit 119 marked
3         for identification and attached to the
4         transcript.)
5         THE WITNESS:  Okay.  I'm opening it now.
6         Okay.  It's open.
7  BY MR. SHAPIRO:
8      Q. Okay.  And let me know when you've taken
9  a look at 119.
10     A. Okay.  I've read it.
11     Q. Okay.  In the second paragraph -- so this
12 is an e-mail in which you're reporting back to
13 Allan and Stephen Garchik about your meeting with
14 ███████████████ right?
15     A. Correct.
16     Q. And it's the -- okay.  ███████████

21 ████████████████████

Page 164

4      Do you see that?
5      A. Yes, I do.

9      Do you see that?
10     A. Yes.

15     MR. MAGLIERY:  Objection.
16     THE WITNESS:  Okay.  I can go?
17     MR. MAGLIERY:  Go ahead, please.

Page 165



42 (Pages 162 - 165)

Page 170

1  BY MR. SHAPIRO:
2     Q.  Do you see Garchik is asking you -- it's
3  now two or three weeks later, and Garchik is
4  asking you, "Do we have any offers?"
5         Do you see that?
6     A.  "Do we have any offers?  What's the next
7  step?"
8         Okay.  I see that.  Yes.
9     Q.  And you said, "■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■
11  ■■■
12  ■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■
14        MR. MAGLIERY:  Objection.
■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■
17  BY MR. SHAPIRO:
■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■

Page 171

1        Do you see that?
2     A.  Yes.
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■
■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■
16        THE REPORTER:  I'm sorry.  This is
17  Christina.  Mr. Friedman, can I ask you to wait
18  for the question before answering?  There's just a
19  lot of talking over each other right now.
20        THE WITNESS:  Okay.
21  BY MR. SHAPIRO:
■■■■■■■■■■■■■■■■■■■■■■■■■■



Page 172

(redacted)

Page 173

(redacted)
8        MR. MAGLIERY:  Objection.
(redacted)
11  BY MR. SHAPIRO:
(redacted)



49 (Pages 190 - 193)