# EXHIBIT 12

# PUBLIC - REDACTED COPY

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3    - - - - - - - - - - - - - -x
 4      SM KIDS, LLC              :
 5          Plaintiff             :
 6          v.                    :   Civil Action No.
 7      GOOGLE, LLC, et al.       :   1:18-cv-02637-LGS
 8          Defendants            :
 9    - - - - - - - - - - - - - -x
10
11
12
13                          - - -
14                Monday, January 18, 2021
15                          - - -
16
17
18
19    REMOTE ZOOM AUDIO/VIDEO deposition of ROBERT
20    FRIEDMAN, beginning at 10:02 a.m., before
21    Christina S. Hotsko, RPR, CRR, when were present on
22    behalf of the respective parties:
```

Page 30

1    MR. MAGLIERY: Objection.
2    THE WITNESS: Well, the first step was to
3 share our plan with Steve, because he was going to
4 be funding this himself.
5 BY MR. SHAPIRO:
6    Q. And then -- and then the plan would be
7 shared with investors, platforms, and potential
8 media partners?
9    A. Yes.
10   Q. And the idea was that one of those
11 investors, platforms, or potential media partners
12 could either buy the website or invest in the
13 development of the website; is that fair?
14   MR. MAGLIERY: Objection.
15   THE WITNESS: The ongoing assumption was
16 that we would produce and develop the content with
17 whichever partner we did in the same way that most
18 television is done.
19 BY MR. SHAPIRO:
20   Q. And that could also include selling the
21 website?
22   MR. MAGLIERY: Objection.

Page 31

1    THE WITNESS: It was not discussed in
2 terms of selling the website. It was looking at a
3 partner to fund it. What rights they would have
4 as opposed to what rights we would have had not
5 been discussed at that point until we had the
6 discussions with them.
7 BY MR. SHAPIRO:
8    Q. If you look at the third sentence it
9 says, "We have developed our go-forward strategy
10 on what to include in the presentation to
11 investors, platforms, and potential media partners
12 who may also represent buyers."
13   Do you see that?
14   A. Yes.
15   Q. Wasn't a sale of the website one of the
16 options on the table?
17   MR. MAGLIERY: Objection.
18   THE WITNESS: I'm trying to understand,
19 you know, your question.
20   A buyer would still need someone to
21 produce the content. So the ingoing assumption
22 was that is that we would develop that. You know,

Page 32

1 how much of that investment or how much of equity
2 they would own, really, at this stage it was too
3 early to decide. It's as if you were going in
4 with a television series or a movie to a network.
5 They may say, I'm willing to put up half or I'm
6 willing to fund it all or a whole variant, if you
7 will. So it really wasn't contemplated at this
8 point.
9 BY MR. SHAPIRO:
10   Q. And was the development of the
11 presentation to investors, platforms, and
12 potential media partners for the purpose of
13 attracting a party that would fund the development
14 of the content for the new reskinned website?
15   A. Yes.
16   MR. MAGLIERY: Objection. Sorry.
17 BY MR. SHAPIRO:
18   Q. And who is Karen Salmansohn?
19   A. Karen was the woman that Garchik and
20 Allan had worked with early on on some of the
21 development of this. And they decided -- and
22 asked us if we would speak with her to see whether

Page 33

1 it made sense for her to continue in some form on
2 the group that we put together to move forward.
3    Q. And had you worked with Karen Salmansohn
4 before?
5    A. No.
6    Q. And what did you decide with respect to
7 whether or not you would work with Karen
8 Salmansohn going forward?
9    A. We thought that she had some interesting
10 creative instincts. We thought that she could
11 work with us on the go-forward. But there were
12 business reasons why we decided not to go forward
13 with her.
14   Q. And what were those business reasons?
15   A. Her role was to be a work-for-hire role
16 to come up with some story, and I think her
17 expectation was that her role would be greater
18 than that, either as an equity partner or
19 something else.
20   Q. And this e-mail is dated April 2016.
21 With -- in relation to this e-mail, when did your
22 relationship with Mr. Garchik and Mr. Cohen in

9 (Pages 30 - 33)

Page 50

1 to create other deliverables, but the deliverables
2 included a branding package, even in terms of the
3 newer deliverables. There were just different
4 elements within them.
5    Q. Okay.
6    A. This did not reflect necessarily the
7 content that we delivered, is what I'm trying to
8 say, in other words.
9    Q. But one of the deliverables you provided
10 was a presentation that could be delivered to
11 potential investors?
12    A. Oh, yes. Yes.
13    Q. And one of the deliverables that you
14 provided was a demo website, correct?
15    A. It wasn't necessarily a demo website. It
16 was content for the website.
17    Q. Okay. And do you see that it refers to
18 the visual reskin of the website?
19    A. Yes.
20    Q. What does that mean?
21    A. That means the stuff that was on the
22 website would be different stuff.

Page 51

1    Q. And did Bungalow also design a new logo
2 for the website?
3    A. Yes.
4    Q. And did Bungalow change the architecture
5 of the website?
6       MR. MAGLIERY: Objection.
7       THE WITNESS: Could you clarify what you
8 mean by that?
9 BY MR. SHAPIRO:
10    Q. Well, it says, in the third bullet point,
11 "New website architecture."
12       Do you see that?
13    A. In terms of going from one place to
14 another, if that's what you're referring to, yes.
15 How you navigate the website was obviously
16 different.
17    Q. And at the bottom of the page it suggests
18 that the investor presentation and the content,
19 the initial content for the website, would be
20 completed by September of 2016.
21       Do you see that?
22    A. Uh-huh. Yes.

Page 52

1    Q. Let me ask you to turn back to the first
2 page of Exhibit 103, or the first page of the
3 engagement agreement.
4    A. Okay. Hold on.
5       You're talking about 145, or are you
6 talking about 146?
7    Q. 146.
8    A. Yep, it's up.
9    Q. Do you see in that first paragraph at the
10 bottom of the page it says that Bungalow would
11 receive a 25 percent interest in the property?
12    A. Yes.
13    Q. And the property is defined as the
14 Googles.com domain and then all of the related
15 URLs, character designs, websites, story lines,
16 trademarks, and other intellectual property
17 rights.
18       Do you see that?
19    A. Yes.
20    Q. So you received a 25 percent interest in
21 the Googles intellectual property; is that
22 correct?

Page 53

1    A. Yes.
2    Q. And in effect, you became a co-owner of
3 that property, correct?
4       MR. MAGLIERY: Objection.
5       THE WITNESS: I wouldn't necessarily call
6 it a co-owner. I would get a 25 percent
7 distribution.
8 BY MR. SHAPIRO:
9    Q. Didn't you write an e-mail to your staff
10 describing Bungalow as a 25 percent co-owner?
11    A. Yes, but that's just the language we use.
12 It wasn't a legal representation of what ownership
13 means.
14    Q. Well, you understood that you had a right
15 to 25 percent of the profits of this enterprise,
16 correct?
17    A. After certain expenses that the owners
18 had spent, which is why it was a distribution.
19    Q. And those expenses are described in
20 paragraph 4 on the next page, correct?
21       MR. MAGLIERY: Objection.
22       THE WITNESS: Yes.

14 (Pages 50 - 53)

Page 54

BY MR. SHAPIRO:
Q. So after the first $1.25 million were paid to SJM and Taral, as set forth in subparagraph 4a, Bungalow was entitled to 25 percent of the profits of the business, correct?
A. Yes.
Q. And did you understand that Taral also owned 25 percent of the intellectual property?
MR. MAGLIERY: Objection.
THE WITNESS: My understanding was that they owned 50 percent, and they were giving me 25 percent of the proceeds, the distribution proceeds.
BY MR. SHAPIRO:
Q. And in that -- when you refer to "they," you mean Taral, correct?
A. Yes. Allan Cohen.
Q. And let me ask you to read all of paragraph 1, which begins at the bottom of the first page of the agreement and continues on to the top of the second page, and then I'm going to

Page 55

ask you a specific question after you've been able to read all of that paragraph.
A. Okay.
Q. Do you see there's a sentence that says, "If, during the term, Bungalow, SJM, or Taral receives a solicitation of interest from a third party to acquire the rights in and to the property or enter into a joint development proposal that SJM and Taral each considers a bona fide offer for the rights, then SJM, Bungalow, and Taral, shall set up a new entity (NewCo) and assign their rights in and to the property to NewCo"?
Do you see that?
A. Yep.
Q. So one of the probabilities under this agreement was that SJM, Taral, and Bungalow would sell the intellectual property to a third party, correct?
MR. MAGLIERY: Objection.
THE WITNESS: I understand this -- and I can take a look another look at this -- to be that if we were to do a deal with either a network or a

Page 56

financing partner, that there would be a NewCo developed where, at that point, Bungalow could be an owner of this property, whatever that means, depending on what the deal was done.
It didn't suggest to me the sale of this to a third party; it was just, why do that right now? I was fine with the distribution proceeds at 25 percent at this point. And should we move forward, they would create a NewCo.
That's the way I understood it.
BY MR. SHAPIRO:
Q. I'm asking you specifically about the part of this sentence that refers to solicitation of interest from a third party to acquire the rights.
Do you see that?
A. Yeah.
Q. And that suggests that one of the possibilities under this agreement is that SJM and Taral and Bungalow would sell their interest in the property, correct?
MR. MAGLIERY: Objection.

Page 57

THE WITNESS: Well, not necessarily correct. I mean, this is a broad piece of language that could be -- that this company was receiving -- us -- a license fee, meaning whatever that deal -- could be a broad range of deals. It could be getting the rights, I suppose. It could be providing the dollars to fund this NewCo. It could be a deal that has any which way of a split, either in terms of ownership or revenue.
So it's not -- what I think you're asking is selling this entire property. There was a broad continuum of what a deal could look like.
BY MR. SHAPIRO:
Q. And one of those possibilities along that continuum was selling the property, correct?
MR. MAGLIERY: Objection.
THE WITNESS: Yes. It's not really what we were thinking. But if we went out with this property and someone said, God, this was a really valuable brand and I think I could do some really great things with this and I'm willing to pay you $80 million for it today, I guess, living in the



Page 154

Page 155

11    MR. SHAPIRO: Let me mark as Exhibit 118
12  an e-mail Bates stamped BUNGALOW2841 through
13  BUNGALOW2903.
14    (Friedman Deposition Exhibit 118 marked
15    for identification and attached to the
16    transcript.)
17    THE WITNESS: Nothing yet.
18    MR. SHAPIRO: Okay. It's coming.
19    MR. LOW: It should be up.
20    THE WITNESS: Now it just came up. Let
21  me pull it up. Okay.
22

Page 156

1  BY MR. SHAPIRO:
2    Q.  Have you had a chance to look at 118?
3    A.  Yes.

Page 157

CONFIDENTIAL

Page 186

1  Kids, correct?
2       MR. MAGLIERY: Objection.
3       THE WITNESS: Yes. I -- yes, I think so.
4  I don't remember the exact date. But if it's
5  2017, yes.
16      MR. SHAPIRO: Let me mark as Exhibit 123
17  a document Bates stamped SMKIDS10438.
18      (Friedman Deposition Exhibit 123 marked
19       for identification and attached to the
20       transcript.)
21  BY MR. SHAPIRO:
22      Q. And let me know when you've had -- it's

Page 187

1  actually 10438 through 10440.
2       A. 124, correct?
3       MR. MAGLIERY: It's Exhibit 123, I think.
4       THE WITNESS: Oh, 123? Okay.
5       MR. SHAPIRO: Right. And it's
6  SMKIDS10438 through 10440.
7       THE WITNESS: Okay. I have it up.
8  BY MR. SHAPIRO:
9       Q. Let me know when you've had a chance to
10  read it.
11      A. Okay.

Page 188

14  BY MR. SHAPIRO:
15      Q. You're referring to --
16      MR. MAGLIERY: You --
17  BY MR. SHAPIRO:
18      Q. -- the conversation on the -- the soft
19  pitch on the airplane?
20      You give the testimony, Mr. Friedman.
21      THE WITNESS: I -- what? I'm sorry?
22      MR. MAGLIERY: You give the testimony.

Page 189

CONFIDENTIAL



49 (Pages 190 - 193)

CONFIDENTIAL



CONFIDENTIAL

50 (Pages 194 - 197)

Page 226

1    MR. MAGLIERY: As soon as we go off the
2 record.
3    VIDEO TECHNICIAN: We're going off the
4 record at 3:18 p.m. today. That concludes today's
5 testimony given by Mr. Robert Friedman.
6    (Whereupon, at 3:18 p.m., the remote
7    videotaped deposition of ROBERT FRIEDMAN
8    was concluded.)

Page 227

1          C E R T I F I C A T E
2    I do hereby certify that the aforesaid
3 testimony was taken before me, pursuant to
4 notice, at the time and place indicated; that
5 said deponent was by me duly sworn to tell the
6 truth, the whole truth, and nothing but the
7 truth; that the testimony of said witness was
8 taken by me in stenotypy and thereafter reduced
9 to typewriting under my direction; that said
10 statement is a true record of the proceedings;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this statement was taken; and, further,
14 that I am not a relative or employee of any
15 counsel or attorney employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of this action.

22       CHRISTINA S. HOTSKO, RPR, CRR.

Page 228

1 John Magliery, Esquire
2 johnmagliery@dwt.com
3          January 28, 2021
4 RE:   SM Kids LLC v. Google LlC, et al.
5    1/18/2021, Robert Friedman (#4396279)
6    The above-referenced transcript is available for
7 review.
8    Within the applicable timeframe, the witness should
9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-midatlantic@veritext.com
17  Return completed errata within 30 days from
18 receipt of transcript.
19  If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
22       Yours,
23       Veritext Legal Solutions

Page 229

1 SM Kids LLC v. Google LlC, et al.
2 Robert Friedman (#4396279)
3        E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
23 _____  _____
24 Robert Friedman         Date