# EXHIBIT 13

Page 1

1           UNITED STATES DISTRICT COURT
2         FOR THE SOUTHERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - -x
4     SM KIDS, LLC,           :
5         Plaintiff,          :
6         v.                  :  Civil Action No.
7     GOOGLE, LLC, et al.,    :  1:18-cv-02637-LGS
8         Defendants.         :
9    - - - - - - - - - - - - -x
10
11
12
13                        - - -
14             Monday, January 11, 2021
15                        - - -
16
17
18
19   REMOTE ZOOM AUDIO/VIDEO deposition of MATTHEW MAZER,
20   beginning at 10:11 a.m., before Christina S.
21   Hotsko, RPR, CRR, when were present on behalf of the
22   respective parties:

Page 10

1   Q. And what kind of work do you do?
2   A. I do -- I'm a member of an LLC that does
3   productions. I also do consulting.
4   Q. And what kind of productions do you do?
5   A. I general- -- I generally specialize in
6   films relating to -- documentary films.
7   Q. And what is the name of the LLC?
8   A. One of them is Unfinished Business II.
9   Q. Well, you were saying that you were a
10  member of an LLC that does productions, and so I
11  was just trying to get the name of that LLC.
12  A. That's the LLC. That, I believe, is the
13  one that's currently active in production.
14  Q. And you say you also do consulting?
15  A. Yes.
16  Q. What kind of consulting do you do?
17  A. Upon request, I can do -- I can do
18  management consulting relating to entertainment.
19  Q. And with respect to your documentary
20  producing, is there a specific subject area in
21  which you make documentary films?
22  A. Genocide.

Page 11

1   Q. And with respect to your management
2   consulting in the entertainment industry, is there
3   a particular area of specialization?
4   A. When practicing, yes.
5   Q. When you say "when practicing," what do
6   you mean by that?
7   A. If I have active clients, it would be
8   generally in the kids or entertainment-related
9   consumer products areas.
10  Q. So do you mean that when you are
11  consulting, it would be -- when you are consulting
12  in the entertainment industry, it's in the kids
13  space or it's in the consumer products space? Is
14  that what you were conveying?
15  A. Yes.
16  Q. In addition to kids and consumer
17  products, do you have any other areas of
18  specialization in connection with your management
19  consulting?
20  A. Presently, no.
21  Q. Did you attend college?
22  A. Yes.

Page 12

1   Q. What year did you attend college?
2   A. 1968 to 1973.
3   Q. And where did you attend?
4   A. University of California Los Angeles.
5   Q. And did you receive a degree?
6   A. No.
7   Q. Okay. Have you ever received a
8   university degree?
9   A. No.
10  Q. And what did you study while you were at
11  UCLA?
12  A. Political science and university
13  administration.
14  Q. Okay. And what did you do -- why don't
15  you, as best you can, as a way of moving this
16  along, can you walk me through your career after
17  you left UCLA?
18  A. Yes. After UCLA -- after UCLA, I was an
19  assistant to the office of the chancellor at UCLA
20  for a period of time. Then I joined my -- a
21  manufacturing business in New York City for a
22  period of, I think, six or seven years.

Page 13

1   Q. And then what?
2   A. And then I went into the entertainment
3   business.
4   Q. And what was the manufacturing business
5   that you joined in New York City?
6   A. A manufacturer of jewelry and
7   accessories.
8   Q. And when did you leave that business,
9   roughly?
10  A. I left that business in 1980, had a
11  consulting assignment in Japan relating to that
12  business for another period of time, and upon my
13  return, went into entertainment-related
14  businesses.
15  Q. And when you went into
16  entertainment-related businesses, what is the
17  first thing that you did in the entertainment
18  industry and when was that?
19  A. It would be 1981 or '82. And it would be
20  motion picture exhibition.
21  Q. What is motion picture exhibition?
22  A. That would be putting what were then

Page 66

1 was that there seemed to be a similarity between
2 the names.
3   Q. And why was Mr. Garchik meeting with you?
4 What was he proposing to do with you at that time?
5   A. I don't know the word "propose" is an
6 appropriate term here. Allan Cohen knew that I
7 had been in the kids business -- right? --
8 variously, repeatedly, and somewhat successfully
9 over -- in his opinion -- right? -- over a period
10 of 20 years. And Allan asked if there was -- if I
11 could listen to the situation and see if there's
12 any -- if I had any recommendations for -- as a
13 friend, to his friend, Steve Garchik.
14   Q. And did you have recommendations?
15   A. Yes.
16   Q. And what were your recommendations at
17 that time, at that early stage in getting to know
18 Mr. Garchik and hearing about this?
19   A. I believe my recommendations were to
20 examine the property for its -- what I generally
21 do with any kids property is research -- from a
22 property standpoint, attribute standpoint, is

Page 67

1 research it for its appeal; second, check its --
2 have an attorney check its current trademark
3 status -- right? -- and gather as much of the
4 prior material as was possible to evaluate.
5 Right? And then see what the next steps were.
6   Q. So research for its -- research it for
7 its appeal; is that correct?
8   A. Research it.
9   Q. For its appeal; is that what you said?
10   A. Research the characters, yes, to see --
11 to see -- to -- what its status was and to what
12 groups it would be -- it would be appealing or
13 relevant to promote it.
14   Q. And --
15   A. Since --
16   Q. -- number two was to check its trademark
17 status?
18   A. Not necessarily in this order. Yes,
19 check its trademark status.
20   Q. And number three was to get as much of
21 the prior material as possible, correct?
22   A. To get as much of the material as

Page 68

1 possible to -- to see what the -- what the
2 property was. Right? I deferred all legal
3 questions elsewhere.
4   Q. Okay.
5     MR. SHAPIRO: Let's take a five-minute
6 break and we'll get back on the record. Okay?
7     MR. BROUNELL: Okay. Please mute your
8 camera and video after we take a break, Matt.
9     VIDEO TECHNICIAN: Please stand by.
10    The time now is 11:32 a.m. We're going
11 off the record.
12    (A recess was taken.)
13    VIDEO TECHNICIAN: The time now is
14 11:43 a.m. We're going back on the record.
15 BY MR. SHAPIRO:
16   Q. Mr. Mazer, I'm going to show you some
17 documents that relate to each of the activities
18 that you just described with respect to the
19 Googles business, but I wanted to ask you to
20 describe each of them in some detail at the
21 outset.
22    So first, let me ask you: When you said

Page 69

1 you had proposed to research the Googles brand for
2 its appeal, what did you mean by that?
3   A. I meant to research the Googles brand to
4 see what appropriate age groups, to see -- and --
5 were -- it would be suited for -- right? -- to
6 find -- to figure out how kids within those age
7 groups reacted to it. Right? And I was also told
8 anecdotally that it had some special purpose or
9 special benefit for kids with special needs.
10   Q. Got it.
11    And with respect to checking on its
12 trademark status, what did you do to check on the
13 trademark status of the Googles brand?
14   A. I believe that I went to the USPTO
15 website, looked it up, and then shared the link
16 with Allan and Steve showing its -- what I -- what
17 appeared as its current status.
18   Q. And do you recall what the current status
19 was of the trademarks associated with the brand?
20   A. I don't recall, but perhaps you can
21 refresh me.
22   Q. And did you retain a lawyer by the name

18 (Pages 66 - 69)

Page 82

1  A. I -- I do not believe I received a copy
2  of the website in electronic form. I don't recall
3  doing so, nor do -- I don't recall doing so, no.
4  Q. Do you recall receiving a representation
5  of the website in any form?
6  A. I might have -- let me think.
7      I might have seen some screen shots of
8  the website. Right? I might have -- and I might
9  have, at some point, viewed something that looked
10 like it was from the website and moved. Right?
11 But I don't -- I think -- upon recollection, I
12 think I saw something that was the website, but it
13 wasn't in a form that I could -- that I had a way
14 to replicate.
15 Q. What do you mean by that?
16 A. I think I sat down -- I think I may have
17 sat down and taken a look at it with Allan. I'm
18 not sure. I don't recall. I really don't recall.
19     The best answer would be I don't know.
20 Q. Thank you.
21     MR. SHAPIRO: We're going to mark as
22 Defendants' Exhibit 70 an e-mail Bates stamped

Page 83

1  MAZER133.
2      (Mazer Deposition Exhibit 70 marked for
3      identification and attached to the
4      transcript.)
5      MR. BROUNELL: Will this exhibit appear
6  in the exhibit folder, Ian?
7      MR. SHAPIRO: It should.
8      THE WITNESS: Will it be under marked
9  exhibits?
10     MR. LOW: I'm uploading it. Give me a
11 second.
12     Okay. It should be ready.
13     THE WITNESS: I see an exhibit. Should I
14 open it? I'll open it.
15     Yes.
16 BY MR. SHAPIRO:
17 Q. Do you have the document?
18 A. Yes.
19 Q. Okay. Do you recognize Defendants'
20 Exhibit 70?
21 A. I see it. I don't recall writing myself
22 this note, but I guess -- it seems to be something

Page 84

1  that was written to me from me.
2  Q. And do you recall the substance of what's
3  reflected in the note?
4  A. I think it was -- I think it was the
5  long-term plan of everything that I -- that we
6  might do throughout the process of our engagement
7  if it would -- relating to Googles if it was a
8  successful engagement.
9  Q. And do you see the reference to expand
10 Googles' filings to relevant open classes (9, 41,
11 25, 28)?
12 A. Yes.
13 Q. What does that mean?
14 A. I believe it refers -- that that line,
15 expand Googles filings to relevant open classes,
16 refers to trademark classes.
17 Q. And did you do that for the Googles plan?
18 A. I did not.
19 Q. Did Mr. Galloway do that?
20 A. I believe Mr. Galloway created filings
21 for certain classes. Yes.
22 Q. And do you know whether the Googles brand

Page 85

1  expanded their filings to relevant open classes
2  during the period when you were working with
3  Mr. Garchik?
4  A. I believe that Mr. Galloway created some
5  filings during that period.
6  Q. And was he doing that at your direction?
7  A. He was doing that at my -- at my
8  direction, pursuant to the eventual -- the
9  eventual agreement that we had with Mr. Garchik.
10 Q. Pursuant to the consulting agreement
11 between you and Mr. Garchik?
12 A. Between the parties. Yes.
13 Q. And the party that you operated under was
14 Shade Global, correct?
15 A. The agreement was --
16    MR. BROUNELL: Objection. Sorry,
17 objection.
18    But you can answer.
19    THE WITNESS: The agreement was in the
20 name of Shade Global. Yes.
21 BY MR. SHAPIRO:
22 Q. And do you recall the party that

22 (Pages 82 - 85)

Page 86

1  Mr. Garchik used to enter into the agreement?
2     A.  Not at this time, but perhaps you can
3  refresh me.
4     Q.  And how -- just -- I know we've spent a
5  lot of time walking through your career, but can
6  you describe to me how you came to understand
7  trademark filings and expanding trademark filings
8  to open classes?
9         Did you have experience with that kind of
10  work in the entertainment industry at some point
11  in your career?
12     A.  As a business executive in the
13  entertainment community responsible for
14  properties -- right? -- I worked with attorneys to
15  create -- file, create, and maintain and perfect
16  trademarks, which were necessary -- right? -- for
17  my business activities -- right? -- notably to
18  license the properties downstream.
19     Q.  And the second note refers to server
20  review to ascertain deliverables status for all
21  IP.
22         Do you see that?  The second note?

Page 87

1     A.  Yes, I see the -- I see the third note.
2     Q.  Thank you.
3         And what does that refer to?
4     A.  That third note regarding server review
5  was to respond to a particular problem that
6  Mr. Garchik related that the servers were remotely
7  held and needed to be -- and were in some -- and
8  were in some peril and needed to be negotiated and
9  then downloaded to see what was -- what might be
10  on those remote servers.
11     Q.  And do you do that?
12     A.  I did not.
13     Q.  Who did it?
14     A.  It was -- I did the negotiation.  The
15  actual server download was done by somebody
16  working at my direction.
17     Q.  And who was that person?
18     A.  Steven Myer.
19     Q.  And was Steven Myer able to -- what
20  happened with respect to the server?  What was
21  Steven Myer able to do?
22     A.  Eventually, he was able to get some of

Page 88

1  the material off of the remotely held servers
2  and --
3     Q.  Do you --
4     A.  -- I believe and -- I believe and put it
5  on a disk.
6     Q.  And do you recall what material he got
7  off of the remotely held server?
8     A.  I don't fully recall what was on the
9  remotely held server.  I believe it might -- I --
10  I'm speculating that it might have been -- I'm
11  mining my memory.  It might have been some server
12  usage data.  It might have been -- it might have
13  been some content files, which by -- all of which
14  by 2013 were in essentially ancient languages.
15     Q.  What do you mean by ancient languages?
16     A.  They were programed in 2005 and '6 -- '5,
17  I think.  By 2013, they'd been -- those had been
18  superseded by other -- I'm told by other
19  languages.
20     Q.  Did that make it unusable?
21     A.  No.  It just -- I believe it makes it
22  difficult to access without -- without some work.

Page 89

1     Q.  And what happened to that disk?
2     A.  I don't know.
3     Q.  Did you provide that disk to Michael
4  Cohen?
5     A.  No.
6     Q.  And then the next bullet point refers to
7  create brand plan and strategy for launch of
8  Googles as a kids property.
9         Do you see that?
10     A.  That would be the thing starting at the
11  fourth major line, correct?
12     Q.  Right.  Yes.
13     A.  Yes.  I see that.
14     Q.  Did you ever get to that as part of your
15  work for the Googles brand?
16     A.  No.
17     Q.  Why not?
18     A.  Because I believe, in the agreement,
19  these would -- these activities would fall under
20  phase 2.
21     Q.  And phase 2 never got started, correct?
22     A.  Phase 2 was never -- was never

Page 98

1  all services we would provide.  It also, I
2  believe, recommended some services.
3     Q.  So in the first section of this memo,
4  there's a section labeled, "trademark."
5        Do you see that?
6     A.  Yes.
7     Q.  And your lawyers have redacted that
8  section.  And so I don't want you to describe to
9  me what was in that section or what was written in
10 that section, but can you tell me, what was the
11 purpose of the trademark phase of this project?
12       MR. BROUNELL:  And I just instruct the
13 witness not to reveal any privileged information,
14 any conversations you've had with your lawyer
15 about this.
16       THE WITNESS:  Thank you, Geoff.
17       The purpose of the trademark phase was to
18 ensure that the property would appear to be in
19 proper queue in the long journey for registration
20 status.  Right?
21       And my sole purpose of that would be to
22 have something that we could eventually --

Page 99

1  right? -- license and market and partner with
2  third parties.  It's a business -- it's a business
3  use of trademark.
4  BY MR. SHAPIRO:
5     Q.  And what do you --
6     A.  Which I believe is why trademark exists.
7     Q.  What do you mean by have something in the
8  queue?
9     A.  I'm not a trademark expert, but I am a
10 practitioner.  I've been schooled by lawyers as to
11 the various steps in the process of trademark --
12    Q.  And so --
13    A.  -- relating --
14    Q.  But you said that your concern was making
15 sure that the trademarks were in the queue.  Is
16 that what you were explaining?
17    A.  My concern was making -- my concern was
18 making sure that the trademarks were in eventual
19 fit condition that's -- for a -- what would be
20 called, in a license agreement, from a business
21 standpoint only -- right? -- a warranty of
22 marketability or merchantability -- right? --

Page 100

1  which I -- in every license agreement, I have to
2  assert -- right? -- that the -- from a business
3  standpoint, in order to close the deal, that the
4  trade -- that if I'm -- if a trademark is being
5  utilized by a publisher or a -- or someone making
6  t-shirts -- right? -- that the people who are
7  granting them that license -- right? -- have
8  the -- actually have the -- have a trademark that
9  will protect and defend the use of the marks.
10       Now, that's a -- I'm not a lawyer.  I'm
11 giving you a very inarticulate description of why
12 I was told from the beginning by my then -- my
13 past trademark counsel and successive trademark
14 counsels over the years was -- and by licensees,
15 having been a licensee and being a licensor, that
16 you had -- that it would be good to have -- it
17 would be good -- not necessary, but good --
18 right? -- to have trademarks if you're going to
19 involve other people.
20    Q.  And what did you understand needed to be
21 done with the Googles' business to ensure that the
22 brand could warrant the validity of the trademarks

Page 101

1  in any subsequent licensing agreement?
2        MR. BROUNELL:  Objection.
3        To the extent this calls for information
4  you learned from your lawyer in this case...
5        MR. SHAPIRO:  Well, but --
6  BY MR. SHAPIRO:
7     Q.  Are you -- are you not answering the
8  question?  I'm just trying to --
9        MR. BROUNELL:  You can answer the
10 question if --
11       MR. SHAPIRO:  Oh --
12       MR. BROUNELL:  -- you have knowledge that
13 is not garnered from your conversations with your
14 lawyer in this case.
15       MR. SHAPIRO:  Thank you.
16       THE WITNESS:  Okay.  I can answer as a
17 layman.  Right?
18       MR. BROUNELL:  And a layman not conveying
19 information, not conveying conversations you've
20 had with your lawyer about this specific issue.
21       THE WITNESS:  Yes.
22       It appeared and -- it appeared to me that

26 (Pages 98 - 101)

Page 218

1  (Whereupon, at 4:01 p.m., the remote
2  videotaped deposition of MATTHEW MAZER
3  was concluded.)

Page 220

C E R T I F I C A T E

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said witness was taken by me in stenotypy and thereafter reduced to typewriting under my direction; that said statement is a true record of the proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this statement was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

_____
CHRISTINA S. HOTSKO, RPR, CRR

Page 219

Page 221

SM KIDS, LLC, vs. GOOGLE, LLC, et al.
Witness: MATTHEW MAZER

INSTRUCTIONS TO THE WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

PA 4396264