USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/23/2021

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SM Kids, LLC, as successor-in-interest to
Stelor Productions, LLC,

                              Plaintiff,

              -against-

Google LLC et al.,

                              Defendants.

1:18-cv-02637 (LGS) (SDA)

<u>OPINION AND ORDER</u>

**STEWART D. AARON, United States Magistrate Judge:**

Before the Court is a Letter Motion by Defendants Google LLC, Alphabet Inc. and XXVI Holdings Inc. (collectively, the "Defendants") challenging assertions of privilege made by Plaintiff SM Kids, LLC ("SM Kids" or "Plaintiff") on its privilege log. (Defs.' 2/9/21 Ltr. Mot., ECF Nos. 186, 187.) This Letter Motion is resolved as set forth below.

<u>BACKGROUND</u>

I.    <u>Background Facts</u>

The background facts underlying this case are as follows.[1] In 1995, Steven Silvers created the Googles brand. Two years later, he registered the Googles trademark and the internet domain name www.googles.com. The website launched in 1998 as a children's education and entertainment website. That year, the search engine Google adopted the Google name. Subsequently, in 2005, Silvers sued Google for trademark infringement. In February 2007, Silvers

---

[1] The facts set forth in this Background Facts section are adapted from the Second Circuit's Opinion in *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 209-10 (2d Cir. 2020).

assigned all rights in Googles to Stelor Productions, LLC ("Stelor"). In December 2008, Google and Stelor settled the trademark infringement litigation.

As the trademark infringement litigation unfolded, in 2006 Stephen Garchik invested in Stelor. The company soon defaulted on Garchik's loans. Following a bankruptcy proceeding, in 2011 Stelor assigned the "entire interest and the goodwill" of the Googles trademark to Garchik, doing business as Stelpro Loan Investors, LLC ("Stelpro"). By that point, the Googles website remained operational, but there is some evidence that its content was static and quickly growing outdated. Garchik later transferred the Googles assets to SJM Partners Inc. ("SJM"), a company of which he is the sole owner. Following this transfer, Garchik replaced the Googles website with a "coming soon" page, posted a solicitation for joint venture partners, and added some audiovisual content. Finally, in February 2018, SJM transferred the Googles assets to SM Kids, a newly formed firm owned by Garchik.

In February 2018, SM Kids sued Google LLC, Alphabet Inc., XXVI Holdings Inc. and 100 John and/or Jane Doe defendants in New York County Supreme Court, alleging that Google had breached the 2008 settlement agreement. That agreement prohibited Google from "intentionally mak[ing] material modifications to its [then-]current offering of products and services in a manner that is likely to create confusion in connection with Stelor's present business." (Settl. Agmt., ECF No. 23-3, ¶ 7.) Google agreed not to "create, develop and publish children's books, fictional children's videos, or other fictional children's related content that have a title of 'GOOGLE' or a 'GOOGLE-' formative title or mark." (*Id*.)

The complaint alleged that Google had breached that agreement by creating Google Play and YouTube Kids, which publish and distribute children's content. SM Kids further objected to

Google's acquisition of several children's entertainment businesses, including Launchpad Toys and the "Toontastic" application.

## II.   **Dramatis Personae**

In order to put the privilege issues into proper context, certain additional individuals must be identified. These individuals, none of whom is an attorney, are as follows:[2]

Matt Mazer: Mazer was an entertainment industry executive who Garchik engaged in 2013 to advise him on the Googles intellectual property that Garchik had obtained from Stelor. (*See* Defs.' 2/9/21 Ltr. Mot. at 3; Pl.'s 2/16/21 Resp., ECF No. 194, at 7.)

Allan Cohen: A. Cohen is the managing member of Taral Productions, LLC ("Taral"). (Pl.'s 2/16/21 Resp. at 7.) As of February 6, 2014,[3] Taral and Stelpro entered into an agreement with respect to the Googles intellectual property, in which they agreed that any proceeds derived from such property would be divided between Taral and Stelpro. (*See id.*; Taral/Stelpro Agmt., ECF No. 200-3, ¶ 4.) They also agreed that "all decisions related to the [Googles intellectual property] shall be jointly made by Taral and Stelpro." (Taral/Stelpro Agmt. ¶ 3.) The agreement was amended as of December 19, 2014 to provide that certain of the proceeds derived from the property would be divided among Taral, Stelpro and Jared Lader (who is identified below). (*See* Taral/Stelpro Amend., ECF No. 200-4.)

Jared Lader: Lader acted as an employee and an independent contractor of Taral with respect to the Googles intellectual property—*i.e.*, his status changed over time from employee

---

[2] These individuals are set forth in the order they are addressed in Defendants' Letter Motion. (*See* Defs.' 2/9/21 Ltr. Mot. at 2.)

[3] Although the agreement is dated as of February 6, 2014, it was executed on March 2, 2014. (*See* Taral/Stelpro Agmt. at 3.)

to independent contractor. (*See* A. Cohen Dep., ECF No. 199-3, at 35 ("Jared Lader was . . . an employee of Taral [who] basically did everything for me"), 36 (A. Cohen testifying that Lader also worked as an independent contractor); Defs.' 2/9/21 Ltr. Mot. at 3 ("Lader was an independent contractor who worked 'on and off' for [Taral]").) As set forth above, as of December 19, 2014, Lader joined in a profit sharing agreement with respect to the Googles intellectual property. (*See* Taral/Stelpro Amend. ¶ 1.)

Karen Salmansohn: Salmansohn was engaged on behalf of SJM to develop content for googles.com in a work-for-hire capacity. (*See* Pl.'s 2/16/21 Resp. at 9.) As of May 10, 2016, Salmansohn entered into a Collaboration Agreement with Bungalow Media + Entertainment ("Bungalow") "in connection with the development and production of the Googles brand concept." (*See* Salmansohn/Bungalow Agmt. at 1.) However, the Collaboration Agreement stated that she and Bungalow agreed to the terms set forth "in the event" that an agreement was secured with the "Client" (*i.e.*, SJM). (*See id*. ¶ 2.) Bungalow did not secure such an agreement until late June or July 2016, as set forth immediately below.

Robert (Bobby) Friedman: Friedman is a member of Bungalow.[4] (Pl.'s 2/16/21 Resp. at 6.) As of June 30, 2016,[5] SJM retained Bungalow to "solicit a sale, joint venture, or other capital infusion for [SJM] and its primary asset googles.com." (*See* Googles 6/30/16 Agmt. at 1.)

---

[4] There also is an individual named David Cohen ("D. Cohen"), who is an employee of Bungalow, but is no relation to A. Cohen. (*See* Pl.'s 2/16/21 Resp. at 10.)

[5] Although the agreement is dated as of June 30, 2016, it was executed on July 14 and 17, 2016. (*See* Googles 6/30/16 Agmt., ECF No. 199-4, at 5.)

<u>Carina Sayles and Alan Winnikoff</u>: Sayles and Winnikoff are principals at Sayles & Winnikoff, which is a public relations firm. (*See* Pl.'s 2/16/21 Resp. at 10.) Sayles & Winnikoff was retained by Friedman to promote his efforts to potential investors. (Defs.' 2/9/21 Ltr. Mot. at 3.)

In addition to the foregoing individuals who were not attorneys, an attorney named Robert (Bob) Wyman was a party to many of the communications challenged by Defendants. Wyman was a partner at Wyman & Isaacs LLP ("W&I"), and later became a partner at Davis Wright Tremaine ("DWT"), when W&I was merged into DWT. (*See* Pl.'s 2/16/21 Resp. at 7; Pl.'s 2/19/21 Ltr., ECF No. 200, at 1.) Prior to February 2014, Wyman and W&I represented Taral. (*See* Taral/Stelpro Agmt. ¶ 9.) In the agreement between Taral and Stelpro, they acknowledged the "future representation" of them by W&I and Wyman "related to various matters arising in connection with the [Googles intellectual property]" and agreed to waive any conflict of interest by reason of their prior representation of Taral and joint representation going forward. (*See id*.)

On January 9, 2015, following W&I's merger into DWT, DWT entered into an engagement agreement with A. Cohen and his "related entities . . . in connection with such matters as may be mutually agreed upon." (*See* DWT 1/9/15 Agmt., ECF No. 200-1, at 1.) Later, on September 16, 2015, DWT entered into an engagement agreement with Garchik "in connection with such matters as may be mutually agreed upon," including "in connection with maintenance of selected trademarks and general business transactional matters related to his 'googles' matters." (*See* DWT 9/16/15 Agmt., ECF No. 200-2, at 1.) For "clarity," the engagement agreement with Garchik provided that DWT also would be representing Garchik's "affiliated persons and entities as agreed to by [DWT]." (*See id*. at 1.)

5

III.     **Relevant Procedural History**

On January 19, 2021, Plaintiff produced a privilege log to Defendants that contained 4,587 entries. (*See* Defs.' 2/9/21 Ltr. Mot. at 1.) On February 5, 2021, the parties met-and-conferred, but were at an impasse with respect to certain categories of documents. (*See id*. at 5.) On February 9, 2021, Defendants filed the Letter Motion that is the subject of this Opinion and Order and attached to it Exhibits 1 through 6,[6] which consisted of excerpts from Plaintiff's privilege log containing items that Defendants were challenging. (*See id*., Ex. 1 to 4.)

On February 12, 2021, the Court entered an Order setting forth a briefing schedule for Defendants' Letter Motion, and requiring the parties to each identify exemplar documents from the Exhibits 1 to 5 of the Letter Motion that the Court would subject to an *in camera* review. (*See* 2/12/21 Order, ECF No. 192.) On February 16, 2021, Plaintiff filed its response letter. (*See* Pl.'s 2/16/21 Resp.) On February 16, 2021, Plaintiff transmitted to the Court its exemplar documents from Exhibits 1 to 5 of Defendants' Letter Motion, as well as the single document contained in Exhibit 6, as required, for the Court's *in camera* review.

On February 18, 2021, Defendants identified exemplar documents to be provided to the Court from Exhibits 1 to 5 of Defendants' Letter Motion, and on February 19, Plaintiff transmitted such documents to the Court. Also on February 19, 2021, Defendants filed their reply. (*See* Defs.' 2/19/21 Reply, ECF No. 198, 199.) Oral argument by telephone was held with the parties on February 22, 2021. (*See* 2/22/21 Tr., ECF No. 204.)

---

[6] Each exhibit related to a different individual or entity: Ex. 1 (Mazer), Ex. 2 (A. Cohen), Ex. 3 (Lader), Ex. 4 (Salmansohn), Ex. 5 (Bungalow) and Ex. 6 (Sayles and Winnikoff).

**LEGAL STANDARDS**

**I.     Choice Of Law Regarding Attorney-Client Privilege**

Because this Court's subject matter jurisdiction is based upon diversity (*see* Not. of Removal, ECF No. 1, ¶ 5), state law provides the rule of decision concerning claims of attorney-client privilege. *See* Fed. R. Evid. 501; *Dixon v. 80 Pine St. Corp.*, 516 F.2d 1278, 1280 (2d Cir. 1975); *see also Reliance Ins. Co. v. Am. Lintex Corp.*, No. 00-CV-05568 (WHP) (KNF), 2001 WL 604080, at *2 (S.D.N.Y. June 1, 2001) ("Both Reliance's underlying claim and the defendants' affirmative defense are based on New York law. Therefore, New York law governs the instant claim of privilege."); *Gen. Elec. Co. v. APR Energy plc*, No. 19-CV-03472 (VM) (KNF), 2020 WL 2061423, at *7 (S.D.N.Y. Apr. 29, 2020) ("It is not contested that, in a diversity case, the issue of privilege is to be governed by the substantive law of the forum state." (quoting *Dixon*, 516 F.2d at 1280)).

The settlement agreement at issue in this case provides that it "shall be governed by and construed in accordance with the laws of New York, without giving effect to principles of conflicts of law." (*See* Settl. Agmt. ¶ 16.) The substantive law to be applied in this case is New York law because New York courts honor choice of law provisions in contracts. *See Gen. Elec. Co. v. APR Energy plc*, No. 19-CV-03472 (VM) (KNF), 2020 WL 2061423, at *6 (S.D.N.Y. 2020) ("Under New York law, courts will generally enforce choice-of-law clauses because contracts should be interpreted so as to effectuate the parties' intent." (internal quotation marks omitted) (quoting *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018))); *Bank of New York v. Yugoimport*, 745 F.3d 599, 609 (2d Cir. 2014) ("New York choice-of-law rules . . . 'require[] the court to honor the parties' choice [of law provision] insofar as matters of substance are

concerned, so long as fundamental policies of New York law are not thereby violated.'" (quoting *Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir. 1987))).

Since New York law is the substantive law to be applied in this case, the Court will apply New York law on attorney-client privilege. *See Madelaine Chocolate Novelties, Inc. v. Great N. Ins. Co.*, No. 15-CV-05830 (RJD) (SMG), 2020 WL 606447, at *2 (E.D.N.Y. Feb. 7, 2020) ("This is a diversity jurisdiction case involving a claim of breach of contract under New York law. . . . Accordingly, questions of privilege are governed by New York law." (citations omitted)); *Cytec Indus., Inc. v. Allnex (Luxembourg) & Cy S.C.A.*, No. 14-CV-01561 (PKC), 2016 WL 3542453, at *1 (S.D.N.Y. 2016) ("New York law governs [the attorney-client privilege] inquiry because subject matter jurisdiction is based on diversity of citizenship, and the underlying agreement is governed by New York law 'without regard to principles of conflicts of law.'" (citations omitted)).

The cases cited by Plaintiff to argue that "Florida law applies to communications made in Florida between Floridians because Florida has the most significant relationship with those communications, persons, and conduct" (*see* Pl.'s 2/16/21 Resp. at 2-3) are inapposite. Most of the cases cited by Plaintiff did not involve a breach of contract claim based upon a contract with a New York choice of law provision. *See Microsoft Corp. v. Fed. Ins. Co.*, No. M8-85 (HB), 2003 WL 548758 (S.D.N.Y. Feb. 25, 2003) (third-party subpoena in insurance coverage dispute; no choice of law provision); *AroCHEM Int'l, Inc. v. Buirkle*, 968 F.2d 266 (2d Cir. 1992) (defamation and tortious interference with contractual and commercial relationship claims); *Brandman v. Cross & Brown Co. of Florida, Inc.*, 125 Misc. 2d 185, 185 (Sup. Ct., Kings Cty., 1984) (counterclaim for fraudulent inducement and breach of partnership agreement, but agreement "contained no choice-of-law clause"); *Tartaglia v. Paul Revere Life Ins. Co.*, 948 F. Supp. 325, 326-27 (S.D.N.Y.

1996) (third-party subpoena in breach of contract action; no choice of law provision); *Veleron Holding, B.V. v. BNP Paribas SA*, No. 12-CV-05966 (CM) (RLE), 2014 WL 4184806, at *4 (S.D.N.Y. Aug. 22, 2014) (securities fraud claims; breach of contract claim had been dismissed; no choice of law provision).

In *Askari v. McDermott, Will & Emery, LLP*, 179 A.D.3d 127 (2d Dep't 2019), another case cited by Plaintiff (*see* Pl.'s 2/16/21 Resp. at 3), the New York Appellate Division, Second Department, chose to disregard a choice of law provision in an agreement between the parties and instead applied to assertions of privilege the law of the state where the communications took place. *Id*. at 153-54. In choosing to disregard the choice of law provision, however, the Second Department relied on the fact that the dispute between the parties did not relate to the agreement that contained the choice of law provision. *Id*. at 153 ("Significantly, the issue at bar does not concern a dispute arising under the [agreement]."). In fact, there were multiple documents governing the relationship between the parties, and the singular agreement that did include a choice of law provision was not implicated by the issues in the case. *See id*. ("[T]he choice-of-law provision in the [relevant agreement] is not even implicated here."). In the present case, by contrast, the agreement that contains the New York choice of law clause is the very agreement upon which Plaintiff bases its claims.[7]

Finally, in *Satcom Int'l Grp., P.L.C. v. Orbcomm Int'l Partners, L.P.*, No. 98-CV-09095 (DLC) 1999 WL 76847 (S.D.N.Y. Feb. 16, 1999), also cited by Plaintiff (*see* Pl.'s 2/16/21 Resp. at 2), in the lead up to a preliminary injunction hearing, the court noted that "it appear[ed] that New York

---

[7] In addition, in *Askari*, the Second Department held that enforcement of the choice of law provision would have been contrary to public policy. *See* 179 A.D.3d at 154. Here, there is no suggestion that the application of New York privilege law would be contrary to public policy, nor could there be.

law [would] otherwise apply to the substantive claims in [the] action because of choice of law clauses in the licensing agreements," but nevertheless made "a separate inquiry into which state's law [would] apply" to attorney-client privilege, and used a "grouping of contacts" analysis to determine that Virginia privilege law applied.[8] *See id*. at *1. A fact that distinguishes *Satcom* from the present case is that the plaintiff in that case had asserted a claim for tortious interference with prospective business advantage, in addition to a breach of contract claim. *See id*.

Although the court in *Satcom* does not discuss the language and/or scope of the choice of law clauses at issue in that case, the court may have applied Virginia law because of the presence of the tort claim.[9] To the extent that *Satcom* is read to suggest that a court need not apply New York privilege law to a breach of contract claim where the contract at issue contains a New York choice of law provision, that decision is against the clear weight of authority in the Second Circuit.[10]

---

[8] The *Satcom* court noted that "[n]either party addresse[d] choice of law issues in its letter brief." *See Satcom*, 1999 WL 76847, at *1. Thus, the Court did not have the benefit of briefing by the parties before engaging in its choice of law analysis.

[9] New York courts typically apply the law selected in contractual choice-of-law clauses only to claims sounding in contract, "unless the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties." *H.S.W. Enter., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 141 (S.D.N.Y. 2001). Indeed, as stated in what the Second Circuit has referred to as the "the leading New York case on the scope of choice-of-law clauses," *Fin. One Pub. Co. v. Lehman Bros. Special Fi*n., 414 F.3d 325, 334 (2d Cir. 2005), "the [fact the] parties agreed that their contract should be governed by an expressed procedure does not bind them as to causes of action sounding in tort, and, as to the tort causes of action, there is no reason why all must be resolved by reference to the law of the same jurisdiction." *Knieriemen v. Bache Halsey Stuart Shields Inc.*, 74 A.D.2d 290, 293 (1st Dep't 1980), *overruled on other grounds*, *Rescildo v. R.H. Macy's*, 187 A.D.2d 112 (1st Dep't 1993); *accord Mayaguez S.A. v. Citigroup, Inc.*, No. 16-CV-06788 (PGG), 2018 WL 1587597, at *9 (S.D.N.Y. Mar. 28, 2018) (citing *Knieriemen*).

[10] As noted by Defendants (*see* Defs.' 2/19/21 Reply at 1), the *Satcom* court cited to *Tartaglia*, 948 F. Supp. at 326-27, for the apparent proposition that a different choice of law analysis applied to substantive law

## II.   New York Law On Attorney-Client Privilege

In New York, the statutory codification of the privilege is as follows:

[A]n attorney or his or her employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication . . . .

N.Y. C.P.L.R. § 4503(a)(1).[11] The party asserting privilege carries the burden of establishing "that the communication at issue was between an attorney and a client 'for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship;'" that the communication "is predominantly of a legal character;" and that the communication was confidential. *Ambac Assur. Corp. v. Countrywide Home Loans, Inc*., 27 N.Y.3d 616, 624 (2016) (quoting *Rossi v. Blue Cross & Blue Shield of Greater N.Y.*, 73 N.Y.2d 588, 593-94 (1989)). "The critical inquiry is whether, viewing the lawyer's communication in its full content and context, it

---

claims than applied to privilege claims, even where there is a choice of law clause, *see Satcom*, 1999 WL 76847, at *1, but *Tartaglia* did not involve a choice of law provision.

[11] Under federal law, "[t]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (citing *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007)). New York law on attorney-client privilege is "generally similar to accepted federal doctrine." *Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd.*, 211 F. Supp. 2d 493, 495 (S.D.N.Y. 2002); *accord Argos Holdings Inc. v. Wilmington Tr. Natl. Ass'n*, No. 18-CV-05773 (DLC), 2019 WL 1397150, at *2 (S.D.N.Y. Mar. 28, 2019) ("New York law of attorney-client privilege is, with certain exceptions, substantially similar to the federal doctrine." (internal quotation marks and citation omitted)); *Edebali v. Bankers Stand. Ins. Co.*, No. 14-CV-07095 (JS) (AKT), 2017 WL 3037408, at *4 n.2 (E.D.N.Y. July 17, 2017) ("[T]he distinction between New York and federal law on attorney-client privilege is quite indistinguishable, as the law intersects in all of its facets, and are viewed interchangeably.") (internal quotation marks and citation omitted). Because the law of the two jurisdictions is similar in all respects (except with respect to the common interest exception to privilege waiver, discussed *infra*), the Court sometimes cites to cases applying federal law.

was made in order to render legal advice or services to the client." *Spectrum Sys. Int'l Corp. v. Chem. Bank*, 78 N.Y.2d 371, 379 (1991).

"A corporation's communications with counsel, no less than the communications of other clients with counsel, are encompassed within the legislative purposes of CPLR 4503, which include fostering uninhibited dialogue between lawyers and clients in their professional engagements, thereby ultimately promoting the administration of justice." *Rossi*, 73 N.Y.2d at 592. "The privilege extends to communications of 'one serving as an agent of either attorney or client.'" *Hudson Ins. Co. v. Oppenheim*, 72 A.D.3d 489, 489 (1st Dep't 2010) (internal quotation marks and citation omitted); *accord Khan v. Midland Funding LLC*, 956 F. Supp. 2d 515, 520 (S.D.N.Y. 2013) (citing *Hudson Ins. Co.*); *see also In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 217 (S.D.N.Y. 2001) ("[C]ourts have held that the attorney-client privilege protects communications between lawyers and agents of a client where such communications are for the purpose of rendering legal advice.").[12]

"The proponent of the privilege has the burden of establishing that the information was a communication between client and counsel, that it was intended to be and was kept confidential, and [that] it was made in order to assist in obtaining or providing legal advice or services to the client." *Charter One Bank, F.S.B. v. Midtown Rochester, L.L.C.*, 191 Misc. 2d 154, 166 (Sup. Ct., Monroe Cty., 2002). Such showings must be based on competent evidence, usually

---

[12] Defendants reliance upon *Cohen v. Cohen*, No. 09-CV-10230 (LAP), 2015 WL 745712, at *3 (S.D.N.Y. Jan. 30, 2015), for the proposition that, for the privilege to apply, disclosure by an attorney to an agent must be "necessary for the client to obtain informed legal advice" (*see* Defs.' 2/9/21 Ltr. Mot. at 2) is misplaced. In *Cohen*, the individual to whom attorney-disclosures were made was a litigation funder for the client, not an agent of the client; indeed, the agreement with the funder expressly stated that the funder was "not an agent, employee, servant o[r] representative of" the client or her attorneys. *See Cohen*, 2015 WL 745712, at *1 (S.D.N.Y. Jan. 30, 2015).

through affidavits, deposition testimony or other admissible evidence. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 147 (2d Cir. 1987); *Bowne of N.Y. City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 472 (S.D.N.Y. 1993); *accord EFCG, Inc. v. AEC Advisors, LLC*, No. 19-CV-08076 (RA) (BCM), 2020 WL 6378943, at *3 (S.D.N.Y. Oct. 30, 2020) (citing *Bowne*). The burden cannot be met by "mere conclusory or *ipse dixit* assertions" in unsworn motion papers authored by attorneys. *See von Bulow*, 811 F.2d at 146 (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965)). "[W]hether a particular document is or is not protected [by the attorney-client privilege] is necessarily a fact specific determination . . . most often requiring *in camera* review," and left to the discretion of the trial court. *Charter One*, 191 Misc. 2d at 157 (quoting Spectrum, 78 N.Y.2d at 378).

The party asserting a privilege also has the burden to establish that it has not been waived. *See John Blair Commc'ns, Inc. v. Reliance Capital Grp.*, 182 A.D.2d 578, 579 (1st Dep't 1992); *accord Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 391 (S.D.N.Y. 2015) ("The party invoking the privilege also has the burden to show that the privilege has not been waived." (citation omitted)).

Generally, "disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed." *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973); *see also La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F. Supp. 3d 358, 363 (S.D.N.Y. 2014) ("The attorney-client privilege does not normally attach to privileged communications that are disclosed to persons who are neither the attorney nor the client." (citing *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 n.5 (2d Cir. 2003))). Notwithstanding this general rule, there are circumstances where courts have not found a waiver

even where attorney-client communications were shared with a third party. For example, where persons who receive an entity's privileged communications are the "functional equivalent" of employees, disclosure of otherwise privileged communications to them "does not operate as a waiver of the attorney-client privilege." *See Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, No. 01-CV-03016 (AGS) (HBP), 2002 WL 31556383, at *2 (S.D.N.Y. Nov. 15, 2002) (independent contractors held to be functional equivalent of employees).

In addition, the attorney-client privilege is not necessarily waived by the disclosure of an otherwise privileged communication to a public relations firm. *See Pecile v. Titan Capital Grp., LLC*, 119 A.D.3d 446, 446-47 (1st Dep't 2014) (citing *In re Copper Mkt.*, 200 F.R.D. at 215).[13] However, "[f]or [a party's] press communications to merit protection from disclosure as attorney-client privilege information . . ., '[t]he predominant purpose of a communication must involve legal advice.'" *Breest v. Haggis*, 64 Misc. 3d 1211(A), 2019 WL 3023881, at *1 (Sup. Ct., N.Y. Cty., 2019) (citation omitted). "Though the communications may reflect counsel's legal advice and mental impressions, 'the discussion of such matter with a public relations firm for the primary purpose of advancing a public relations strategy—and not for the purpose of developing or furthering a legal strategy—results in the loss of the protection of attorney-client privilege.'" *Id.* (citation omitted).

One area where the New York law of attorney-client privilege diverges from federal law is with respect to the common interest exception to attorney-client privilege waiver. Under New

---

[13] In *Copper Mkt.*, the client's English language skills were not sufficiently sophisticated for media relations, the communications involving the public relations firm were for the purpose of obtaining legal advice and the documents withheld had not been prepared for business purposes. *See In re Copper Mkt.*, 200 F.R.D. at 215-16.

York law, "where two or more clients *separately* retain counsel to advise them on matters of common legal interest, the common interest exception allows them to shield from disclosure certain attorney-client communications that are revealed to one another for the purpose of furthering a common legal interest." *Ambac*, 27 N.Y.3d at 625 (emphasis in original). However, New York law further requires that the common legal interest involve "pending or reasonably anticipated litigation." *Id*. at 628.[14]

## ANALYSIS

Defendants assert that communications with each of Mazer, A. Cohen, Lader, Salmansohn, Bungalow, Sayles and Winnikoff are not privileged since they are third parties and that the disclosure of privileged information to them waives the privilege. The Court below addresses the privilege issues as to each of these individuals or entities generally and, where applicable, in the context of the exemplars that were provided to the Court for *in camera* review.

## I.   Mazer

### A.   Privilege Issues Generally

The Court finds that, based upon the record before it, as well as its *in camera* review of documents, Mazer was acting as an agent for Garchik and his companies with respect to the Googles intellectual property. However, this does not mean that all communications between Mazer and Garchik are privileged. Rather, in order for communications between Mazer and Garchik to be privileged, they must relate to communications between Garchik and/or Mazer, on

---

[14] As noted by the dissent in *Ambac*, "the majority of federal courts that have addressed the issue, and a significant number of state jurisdictions, either through case law or by statute, have held that the privilege applies even if litigation is not pending or reasonably anticipated." *Ambac*, 27 N.Y.3d at 635 (Rivera, J., dissenting).

the one hand, and counsel for Garchik, on the other, for the purpose of facilitating the rendition of legal advice. *See Rossi*, 73 N.Y.2d at 593.

**B. Exemplar Documents From Exhibit 1 To Defendants' Letter Motion**

Applying the foregoing principles to the exemplars reviewed, the Court finds as follows:

**1. Doc. No. 20201106_817-000022018**

This document is privileged because it reflects a request for legal advice by Garchik to an attorney at the Finnegan law firm. This communication remained privileged even though it was forwarded to Mazer because Mazer was acting as an agent for SJM. Thus, this document need not be produced.

**2. Doc. No. ID004208**

This document is not privileged because it is a communication between Mazer and Garchik, neither of whom is an attorney and does not reflect legal advice from an attorney. During oral argument, Plaintiff withdrew its privilege assertion as to this document. (2/22/21 Tr. at 7.) Thus, this document shall be produced.

**II. A. Cohen**

**A. Privilege Issues Generally**

The Court finds that, based upon the record before it, as well as its *in camera* review of documents, once A. Cohen and Taral, on the one hand, and Garchik and Stelpro on the other, executed the agreement between them on March 2, 2014, they effectively became joint clients of Wyman and W&I. Prior to executing the agreement, however, Wyman and W&I had represented only A. Cohen and Taral. (*See* Garchik Dep., ECF No. 199-5, at 228.) In addition, the Taral/Stelpro agreement provides that all decisions regarding the Googles intellectual property

"shall be jointly made by Taral and Stelpro." (*See* Taral/Stelpro Agmt. ¶ 3.) Thus, as the content and context of the privileged documents reviewed by the Court reflect, the actions of Stelpro (and its successors) and Taral with respect to legal advice in connection with the Googles intellectual property were being carried out on behalf of one another—that is, they essentially were acting as agents for one another.[15] Accordingly, after March 2, 2014, communications between Wyman and/or W&I and Garchik and/or Stelpro are privileged, but such communications prior to that date are not privileged.

**B.  Exemplar Documents From Exhibit 2 To Defendants' Letter Motion**

Applying the foregoing principles to the exemplars reviewed, the Court finds as follows:

**1.  Doc. Nos. ID003100-01, ID004795 & ID006008-09**

These documents are emails regarding drafts of the agreement that Taral and Stelpro executed on March 2, 2014. They are dated prior to March 2, 2014, at which time Wyman and W&I only represented A. Cohen and Taral. Thus, Garchik and/or Stelpro and its successor entities may not claim privilege with respect to these documents, and these documents shall be produced.

---

[15] To be clear, the Court is not applying the common interest exception to attorney-client privilege waiver, which is not recognized under New York law where, as here, there was not pending or reasonably anticipated litigation at the time the communications were made. *See Ambac*, 27 N.Y.3d at 628. As noted in *Ambac*, the common interest exception applies "where two or more clients *separately* retain counsel to advise them on matters of common legal interest." *Id*. at 625 (emphasis in original). In the present case, by contrast, Garchik/Stelpro and A. Cohen/Taral effectively were *joint* clients of Wyman and W&I on and after March 2, 2014, such that the privilege applies under New York law. *See Ambac*, 27 N.Y.3d at 631 ("In the joint client or co-client setting . . . the clients indisputably share a complete alignment of interests in order for the attorney, ethically, to represent both parties [and] there is no question that the clients share a common identity and all joint communications will be in furtherance of that joint representation"). Also, with respect to privileged communications from Wyman and W&I, as well as other counsel, Garchik and A. Cohen shared such communications with one another in circumstances where Taral and Stelpro were contractually required to *jointly* make all decisions regarding the Googles intellectual property, and again their interests are completely aligned.

### 2.  Doc. No. ID20201106_817-000057003

This document is an exchange of emails on December 22, 2014 among Wyman, Garchik, A. Cohen and Lader regarding a court case. By this time, Wyman effectively is representing Garchik, A. Cohen and Taral and these communications are privileged. Since Lader was an agent of Taral, his inclusion on these emails does not waive the privilege. Thus, this document need not be produced.

### 3.  Doc. No. 20201106_817-000022416

This document consists of emails in March 2015 between Greg Galloway, who is a trademark attorney retained by Mazer,[16] and Garchik, which Garchik then forwards to A. Cohen. From the content and context of the emails, it is clear that Galloway was retained to, and did in fact, provide legal advice to Garchik and SJM and that these emails are privileged. The fact that these emails were shared with A. Cohen did not waive the privilege since, as set forth above, A. Cohen through Taral and Garchik through SJM (as successor to Stelpro) essentially were acting as agents for one another with respect to the Googles intellectual property, as they were required to jointly make decisions. Thus, this document need not be produced.

### 4.  Doc. No. 20201106_817-000034942

This document consists of a series of emails, the first of which chronologically is an email from Wyman to Taral in December 2013 regarding the settlement agreement at issue in this case. The email is forwarded to Garchik. As of December 2013, Wyman did not represent Garchik; he

---

[16] *See* Defs.' 2/19/21 Reply at 5 n.2.

only represented A. Cohen and Taral. Thus, Garchik and/or Stelpro and its successor entities may not claim privilege with respect to this document and this document shall be produced.

### 5. Doc. No. 20201106_817-000052471

This document consists of a series of emails. The first four chronologically are March 10, 2014 emails among W&I, Garchik and Taral regarding legal advice and were privileged. However, the emails then were forwarded to Richard Rakowski, a third-party, and the privilege was waived as to the first four emails at that point. The emails between Garchik and Rakowski also are not privileged. Nor are any of the subsequent emails that are part of this chain privileged, since they are not authored by an attorney and do not seek legal advice. Thus, this document shall be produced.

### 6. Doc. No. 20201106_817-000066042

This document consists of an August 22, 2014 email from Wyman to A. Cohen responding to an enclosed voicemail message left by A. Cohen regarding googles.com. The email then is forwarded to Garchik. This document is privileged and need not be produced.

### 7. Doc. No. 20201106_817-000066580

This document consists of August 2014 emails among W&I, SJM and Taral regarding items to be provided to counsel and is privileged. It need not be produced.

### 8. Doc. No. ID004912

This document consists of a series of emails in late February 2014 between and among W&I, Garchik, Taral and A. Cohen regarding drafts of the agreement that Taral and Stelpro executed on March 2, 2014. These emails were sent prior to March 2, 2014, at which time Wyman and W&I only represented A. Cohen and Taral. Thus, Garchik and/or Stelpro and its successor

entities may not claim privilege with respect to this document, and this document shall be produced.

**III.    Lader**

###### A.  Privilege Issues Generally

The Court finds that, based upon the record before it, as well as its *in camera* review of documents, Lader was acting as an agent for and/or was the functional equivalent of an employee of Taral with respect to the Googles intellectual property. Lader was an agent of Taral when he was employed by it, and was the functional equivalent of an employee when he did work for Taral as an independent contractor.

###### B.  Exemplar Documents From Exhibit 3 To Defendants' Letter Motion

Applying the foregoing principles to the exemplars reviewed, the Court finds as follows:

###### 1.  Doc. No. 20201106_817-000052461

This document consists of a series of March 10, 2014 e-mails between and among Lader, Taral, W&I and Garchik regarding legal advice. It is privileged and need not be produced.

###### 2.  Doc. No. 20201106_817-000052477-78

This document consists of a series of emails. The first four chronologically are March 10, 2014 emails among W&I, Garchik and Taral regarding legal advice and were privileged. However, the emails then were forwarded to Richard Rakowski, a third-party, and the privilege was waived as to the first four emails at that point. The emails between Garchik and Rakowski also are not privileged. After Garchik forwards Rakowski's email to A. Cohen, Lader and Wyman, there are emails sent by Wyman that are privileged (*i.e.*, the ones sent at 4:52 p.m. and 5:38 p.m. on March

10, 2014). Thus, this document shall be produced, except that Plaintiff may redact the two Wyman emails referenced in the prior sentence.

### 3.  Doc. No. 20201106_817-000066660

This is an October 23, 2017 email from Lader to SJM and A. Cohen regarding information requested by "the lawyers." It is privileged and need not be produced.

### 4.  Doc. No. 20201121_546-000019059

This document consists of a series of March 2016 emails between and among DWT, SJM and Taral regarding legal matters, the last of which is forwarded by A. Cohen to Lader. This document is privileged and need not be produced.

### 5.  Doc. No. 20201121_546-000019983

This document consists of a September 2015 email sent by A. Cohen to Wyman at DWT regarding legal matters that then is forwarded by A. Cohen to Lader. The document is privileged and need not be produced.

## IV.  Salmansohn

### A.  Privilege Issues Generally

The Court finds that, based upon the record before it, as well as its *in camera* review of documents, Salmansohn was acting as an agent on behalf of SJM through her agreement with Bungalow to develop content for googles.com, and Bungalow secured an agreement with SJM in late June or July 2016. Because Salmansohn was acting as agent for SJM, SJM did not waive privilege by sharing privileged communications with her in and after late June/ July 2016.[17]

---

[17] The Court does not have before it any Salmansohn exemplar documents that fall between the June 30, 2016 "as of" date of Bungalow's agreement with SJM and the July 2016 dates when it was executed. (*See* Googles 6/30/16 Agmt. at 5.) Because a decision regarding whether any of such documents is privileged

**B.   Exemplar Documents From Exhibit 4 To Defendants' Letter Motion**

Applying the foregoing principles to the exemplars reviewed, the Court finds as follows:

**1.   Doc. No. 20201106_817-000023464**

The first chronological email in this document was sent by Salmansohn to A. Cohen and Garchik regarding her "favorite ideas from original proposal." It is not privileged and shall be produced. In the second email, dated May 25, 2016, Garchik communicates to Salmansohn legal advice received from "IP counsel" and then she responds. However, because Salmansohn was not yet acting as agent for SJM in May 2016, Garchik waived attorney-client privilege by sharing the advice with Salmansohn.[18] Thus, there is no privilege and this document shall be produced.

**2.   Doc. No. ID007077**

This document consists of a series of July 2016 emails between Salmansohn and Friedman (and others) regarding her work for, and agreement with, Bungalow. It is not privileged. During oral argument, Plaintiff withdrew its privilege assertion as to this document. (2/22/21 Tr. at 36.) Thus, it shall be produced.

**V.   Bungalow**

**A.   Privilege Issues Generally**

The Court finds that, based upon the record before it, as well as its *in camera* review of documents, Bungalow was retained in late June or July 2016 to solicit a sale, joint venture or

---

depends upon the content and context of such documents, the Court leaves the issue of the privileged status of any such documents open.

[18] During oral argument, the Court had expressed the view that the advice from "IP counsel" could be redacted as privileged, based upon the premise that Salmansohn had been engaged as SJM's agent as early as May 2016. (*See* 2/22/21 Tr. at 34-35.) However, since Salmansohn's agency was through Bungalow and Bungalow's agreement with SJM was "as of" June 30, 2016, and was not executed until July 2016, communications with Salmansohn in May 2016 are not privileged.

other capital infusion for SJM and googles.com. Because Bungalow was acting as agent for SJM, SJM did not waive privilege by sharing privileged communications with Bungalow's representatives in and after late June or July 2016.[19]

**B.   Exemplar Documents From Exhibit 5 To Defendants' Letter Motion**

Applying the foregoing principles to the exemplars reviewed, the Court finds as follows:

**1.   Doc. No. 20201106_817-000033649**

This document consists of an exchange of emails on July 31 and August 1, 2017 between Bungalow and Garchik regarding legal advice from Wyman. It is privileged and need not be produced.

**2.   Doc. No. 20201106_817-000033650**

This is an August 2, 2017 email from Bungalow's Friedman to Garchik (with copies to A. Cohen and D. Cohen) regarding legal advice from Wyman. It is privileged and need not be produced.

**3.   Doc. No. 20201106_817-000035505**

This document contains an August 20, 2014 email from Wyman to Friedman, A. Cohen, Lader and SJM regarding his comments on a "release draft." Since this email pre-dates the June 30, 2016 agreement among Taral, Bungalow and SJM (*see* Googles 6/30/16 Agmt.), any privilege was waived by sharing this email with Friedman. Even though at that point, Friedman may have had a common interest with the parties who received the email, there is no common interest

---

[19] The Court does not have before it any Bungalow exemplar documents that fall between the June 30, 2016 "as of" date of Bungalow's agreement and the date when it was executed. (*See* Googles 6/30/16 Agmt. at 5.) Because a decision regarding whether any of such documents is privileged depends upon the content and context of such documents, the Court leaves the issue of the privileged status of any such documents open.

exception to privilege waiver under New York law since there was no pending or reasonably anticipated litigation at that time. This document shall be produced.

### 4.  Doc. No. 20201106_817-000033669

This document is an August 2017 exchange of emails between Freidman and Garchik. The only portion of this document that is privileged is the third sentence of the email that was sent by Garchik at 10:05 p.m. on August 11, 2017, which relates to work that Wyman was doing. Plaintiff may redact that sentence from the email, but the remainder of the document shall be produced.

### 5.  Doc. No. 20201121_546-000450487

This document contains an August 5, 2015 email from Wyman to A. Cohen that was forwarded to Friedman. Since this email pre-dates the June 30, 2016 agreement among Taral, Bungalow and SJM (*see* Googles 6/30/16 Agmt.), A. Cohen waived any privilege by forwarding the email to Friedman. Again, no common interest exception to privilege waiver exists under New York law since there was no pending or reasonably anticipated litigation at that time. Thus, this document shall be produced.

### 6.  Doc. No. ID004914

This document consists of a series of July 2016 emails between Salmansohn and Friedman (and others) regarding her work for, and agreement with, Bungalow, the second to last of which is an email from Garchik to Salmansohn that he then forwards to Friedman. It is not privileged. During oral argument, Plaintiff withdrew its privilege assertion as to this document. (2/22/21 Tr. at 42.) Thus, it shall be produced.

## VI.    <u>Sayles And Winnikoff</u>

As set forth above, Sayles and Winnikoff are principals at Sayles & Winnikoff, which is a public relations firm retained by Friedman to promote his efforts to potential investors. With respect to the single document contained in Exhibit 6 to Defendants' Letter Motion regarding Sayles and Winnikoff (Doc. No. ID007363), Plaintiff stated that it "is prepared to withdraw its privilege claim over this email because it does not discuss legal advice in any detail and does not discuss how the public relations strategy may relate to legal strategy." (Pl.'s 2/16/21 Resp. at 10.) Thus, this document shall be produced. Plaintiff also stated that it "reserves the right to continue to assert attorney-client privilege and work product protection when appropriate concerning communications that involve legal strategy or preparing for litigation." (*Id*.) In that regard, the Court reminds Plaintiff that, for its press communications to merit protection from disclosure as attorney-client privileged information, the predominant purpose of such communications must involve legal advice. *See Breest*, 2019 WL 3023881, at *1.[20]

\*                                    \*                                    \*

Based upon the Court's guidance and rulings set forth above, the parties shall meet and confer in a good faith effort to resolve any remaining disputes regarding Plaintiff's privilege assertions.

---

[20] To the extent that the work product doctrine protects any communications that were shared with Sayles & Winnikoff, the Court notes that the standards for waiver of the work product doctrine differ from those for waiver of the attorney-client privilege. *See JA Apparel Corp. v. Abboud*, No. 07-CV-07787 (THK), 2008 WL 111006, at *3 (S.D.N.Y. Jan. 10, 2008) ("[W]aiver of the work-product doctrine is significantly more difficult to establish than waiver of the attorney-client privilege. Unlike the attorney-client privilege, the work-product privilege is not necessarily waived by disclosure to any third party; rather, the courts generally find a waiver of the work product privilege only if the disclosure substantially increases the opportunity for potential adversaries to obtain the information." (citations and quotation marks omitted)).

**CONCLUSION**

For the foregoing reasons, Plaintiff shall produce to Defendants within seven (7) days of the date of this Order the following exemplar documents: Doc. No. ID004208, Doc. No. ID003100-01, Doc. No. ID004795, Doc. No. ID006008-09, Doc. No. 20201106_817-000034942, Doc. No. 20201106_817-000052471, Doc. No. ID004912, Doc. No. 20201106_817-000052477-78 (with redactions as noted above), Doc. No. 20201106_817-000023464, Doc. No. ID007077, Doc. No. 20201106_817-000035505, Doc. No. 20201106_817-000033669 (with redaction as noted above), Doc. No. 20201121_546-000450487, Doc. No. ID004914 and Doc. No. ID007363.

No later than March 2, 2021, the parties shall meet and confer as set forth above. No later than March 5, 2021, the parties shall file a joint letter with the Court advising the Court of the status of the meet and confer process.

**SO ORDERED.**

Dated:      New York, New York
            February 23, 2021

_____
STEWART D. AARON
United States Magistrate Judge